N. O. NEVILLE and R. L. JOHNSON v. H. F. D'OENCH, L. R. POWELL and INTERNATIONAL BANK OF ST. LOUIS; H. F. D'OENCH, Appellant.—34 S. W. (2d) 85.

Division One, January 5, 1931.

*Nagel & Kirby, E. G. Curtis* and *H. W. Kroeger* for appellant.

*Fordyce, Holliday & White, Bennett C. Clark* and *Walter R. Mayne* for respondents.

SEDDON, C.—Action in equity, commenced in the Circuit Court of the City of St. Louis on June 20, 1924, wherein plaintiffs (respondents here) seek an accounting and distribution of the profits and assets of an alleged partnership between the plaintiffs and the individual defendants, D'Oench and Powell.

The salient allegations of plaintiffs' verified bill, or petition, are as follows:

"Plaintiffs, for their cause of action, state that in or about the month of December, 1918, each of the plaintiffs separately entered into a certain agreement of partnership with the defendant D'Oench, and that later and to-wit, on or about December 6, 1919, both of the plaintiffs, together with defendant D'Oench, entered into a certain oral agreement of partnership ratifying and defining the said separate oral agreements theretofore entered into by each of the plaintiffs separately with defendant D'Oench. Plaintiffs further state that said partnership agreement provided for the practice of the profession of dentistry in the City of St. Louis, Missouri, by the plaintiffs and the defendant D'Oench, as a partnership; that soon thereafter, plaintiffs were informed by the defendant D'Oench that said defendant had made and entered into an agreement of partnership with the defendant Powell, whereby the said defendant Powell was to be admitted to the said partnership of plaintiffs and defendant D'Oench, upon the same terms as the original partners to the said partnership; that said plaintiffs thereupon ratified and accepted the said alleged contract between defendant D'Oench and defendant Powell; but plaintiffs state that they have had at no time any direct contract with defendant Powell, and that their information as to the said contract between defendants D'Oench and Powell is derived wholly from the statements of said D'Oench.

"Plaintiffs state that under the terms of the partnership agreement between plaintiffs and defendant D'Oench, the said parties

were to practice the profession of dentistry as a partnership, and a lease for a certain suite of offices in the University Club Building in the City of St. Louis, Missouri, was to be taken by defendant D'Oench upon behalf of the partnership; that the said partnership was to be known as D'Oench-Neville; that a certain sum of money, to-wit, the sum of ten thousand dollars was to be borrowed by the partnership for the purchase of equipment and for the purpose of making a loan in the sum of three thousand dollars to the University Club Building, said loan being necessary in connection with the said lease on the said offices leased by the partnership; that the earnings of all of the partners was to be placed in a common partnership fund; that the rent payable for the said offices under the said lease was to be paid out of said partnership fund, but was to be assessed against the individual earnings of the partners, share and share alike; that the miscellaneous expenses of the partnership, including telephone, clerical hire, pay of office employees, laundry and similar items, was to be paid out of the partnership funds, but assessed against the individual earnings of the partners, share and share alike; that supplies, etc., necessary in the conduct of the business should be paid out of the partnership funds, but should be assessed against the individual earnings of each of the partners in proportion to the amount used by each; that each of the partners was to receive a drawing account, which said drawing account was in each case not to exceed one-half of the gross earnings of said individual partner; that the excess earnings of the said partnership, after paying expenses, and drawing accounts, was to be paid first to liquidate the indebtedness aforementioned, incurred for equipment and the loan to the building company; that after the payment of said indebtedness, the said surplus was to be paid to the said partners in proportion to the net earnings of each; that the said D'Oench was to be the fiscal officer of the said partnership and was to have charge and supervision of the books of said partnership and of the depositing of the funds in the International Bank of St. Louis, collection of accounts, payment of bills, payment of taxes, and other business affairs of the said partnership.

"Plaintiffs further state that in pursuance to said oral partnership agreement, hereinbefore referred to, plaintiffs and defendants proceeded with their profession of dentistry and that large revenue was coming into said partnership, which funds and accounts were under the supervision and control of said defendant D'Oench, and out of the profits of said partnership the loan herein referred to was paid off; that at no time during said partnership did the plaintiffs herein draw in excess of fifty per cent of their gross earnings of said partnership, but the plaintiffs herein aver that said defend-

ant D'Oench did at all times draw in excess of fifty per cent of his gross earnings, contrary to said partnership agreement, and in addition thereto said defendant D'Oench, without the knowledge or consent of plaintiffs herein, did draw large and excessive sums of money from the reserve fund of said partnership, the exact amounts plaintiffs herein are unable to state, unless a full accounting is had of the partnership affairs, as hereinafter more fully set forth.

"Plaintiffs further state that they have been notified by said defendant D'Oench to vacate the offices of said partnership as of the first day of July, 1924, and that the services of said plaintiffs, although partners of said defendant D'Oench, would no longer be needed, and has threatened to oust plaintiffs from said offices if plaintiffs did not voluntarily leave at that time; that plaintiffs herein have a large and substantial interest in said partnership accounts, office appliances, fixtures and supplies on hand, but said defendant D'Oench, contrary to the express partnership agreement, refuses to make a distribution of the partnership assets pursuant to the terms of said partnership agreement; that if said plaintiffs are required to leave said offices on the first day of July, 1924, plaintiffs will be deprived of the use of said offices and cannot carry on their business of dentistry, to the detriment of themselves and their patients, and will suffer irreparable loss and damage by reason thereof.

"Plaintiffs further state that said defendant D'Oench has, without the knowledge or consent of said plaintiffs, taken the books of said partnership from said offices, and has on various occasions stated that certain changes had to be made in said books and accounts of said partnership, as said books and accounts were incorrect; that plaintiffs have reason to believe, and do believe, that if said books and accounts are left in the possession and control of said D'Oench the said books and accounts will be changed to suit the ways and means of said defendant D'Oench, to the detriment of plaintiffs herein.

"Plaintiffs further state that they have reason to believe, and do believe, that the books of account of said partnership will show that plaintiffs are entitled to receive their profits and proportionate part of the earnings an amount in excess of $15,000; that plaintiffs have no ways and means in which to ascertain the exact amount due from said partnership as their profits unless a full accounting is made of said partnership affairs and a receiver be placed in charge of said partnership until proper audit can be made of said books of accounts and records, and if said defendant D'Oench is permitted to carry on and conduct said partnership affairs as he has done in the past, plaintiffs herein will suffer irreparable damage and loss and be deprived of their profits and earnings of said partnership.

"Plaintiffs further state that they now have in their possession funds of said partnership in excess of $900, which plaintiffs are ready and willing to deposit to the credit of the said partnership, but said defendant D''Oench has notified said plaintiffs that said funds in their possession would not be received as partnership funds, and has instructed said employees of said partnership not to accept said funds or to consider said plaintiffs as partners in said firm.

"Plaintiffs further state that they have no adequate remedy at law, but seek to do equity in the premises."

The prayer of the petition is for an injunction against the individual defendants, D'Oench and Powell, restraining said defendants from conducting or carrying on the affairs and business of the alleged partnership; that a receiver be appointed to take charge of the assets, books of accounts, and records of the alleged partnership; that said books and records be impounded until an audit can be made of the same; that the individual defendants be enjoined from withdrawing the funds of the alleged partnership on deposit in the International Bank of St. Louis, and that the defendant bank be enjoined from paying out any funds on deposit and standing in the name of "D'Oench-Neville;" and for an accounting and distribution of the funds and assets of the alleged partnership.

The joint and verified answer of the individual defendants, D'Oench and Powell, is a general denial of each and every allegation of the petition. By stipulation of the parties, the funds on deposit in the defendant bank remained intact during the pendency of the action, so that the defendant bank is merely a nominal defendant, and filed no pleading in the cause and made no appearance on the trial.

The trial court, on January 7, 1925, appointed Hon. William M. Kinsey as referee to hear all issues raised and joined by the pleadings aforesaid, with full power to rule and decide all matters of evidence, and to report all findings (of both fact and law) to the court with convenient speed. A trial of the issues was had before the referee, who thereafter, on February 24, 1926, filed his written report in the circuit court, setting forth his findings of fact and law, and recommending the form and content of a decree and judgment to be entered in the cause. The report and recommendations of the referee being adverse to the defendant D'Oench, said defendant, in due time, filed written exceptions to the report of the referee.

Thereafter, on March 9, 1926, defendants D'Oench and Powell, by leave of court, filed an amended answer in the cause, denying generally each and every allegation of the petition, and affirma-

tively pleading the following new matter, by way of defense and bar to plaintiffs' action:

"For further answer, defendants state that defendant H. F. D'Oench, at all times mentioned in plaintiffs' petition, claimed absolute proprietorship of the business and practice of dentistry conducted at that certain suite of offices in the University Club Building referred to in plaintiffs' petition; that defendant D'Oench at divers times communicated to each of plaintiffs his claim of absolute proprietorship; that defendant D'Oench established the mode of compensation for services of plaintiffs H. O. Neville and R. L. Johnson, and of defendant L. R. Powell, and communicated to each of plaintiffs, and to defendant L. R. Powell, that plaintiffs and defendant L. R. Powell were not entitled to any compensation except that so fixed; that plaintiffs acquiesced in the statements and the course of dealing established by the defendant H. F. D'Oench: that defendant H. F. D'Oench, by plaintiffs' acquiescence, was induced to continue to permit plaintiffs to continue in said business and practice with defendant, to defendant D'Oench's great injury; that plaintiffs are now estopped to deny the proprietorship of said business and practice of dentistry by defendant D'Oench, and are estopped to deny that the compensation established by him constituted full consideration for their services.

"For further answer, defendants state that at all times mentioned in plaintiffs' petition, defendant H. F. D'Oench claimed absolute proprietorship of the business and practice of dentistry conducted at that certain suite of offices in the University Club Building in St. Louis mentioned in plaintiffs' petition; that defendant H. F. D'Oench communicated his claim of absolute proprietorship of said business and practice of dentistry to plaintiffs H. O. Neville and R. L. Johnson, and to defendant L. R. Powell; that defendant D'Oench established a mode of compensation for the services of plaintiffs H. O. Neville and R. L. Johnson, and defendant L. R. Powell, and communicated to plaintiffs and to defendant L. R. Powell that plaintiffs and defendants were not entitled to any compensation except that so fixed; that plaintiffs, well knowing of the claim of defendant H. F. D'Oench to absolute proprietorship of said business and practice of dentistry, and of his intention that the compensation given them under the mode of compensation established by defendant H. F. D'Oench should constitute the full consideration for their services, took no action to establish any other relationship, or to assert any claim to further compensation, until the date of the filing of the petition in this cause; that, for more than five years prior to the date of the filing of the petition in this cause, plaintiffs continued to perform services in the business and practice of dentistry in the said suite at the University Club Building in St.

Louis, and accepted the compensation distributed to them in accordance with the mode of compensation established as aforesaid by defendant H. F. D'Oench; that plaintiffs should be barred by their acquiescence and laches from asserting the claims set up in their petition.''

Thereafter, on March 10, 1926, plaintiffs filed their motion to strike said amended answer of defendants, D'Oench and Powell, from the files; and, on the same day, plaintiffs filed their motion to confirm and approve the referee's report and to enter a decree and judgment thereon.

On January 17, 1927, the trial court made and entered an order sustaining plaintiffs' motion to strike defendants' amended answer from the files; overruling the exceptions of defendant D'Oench to the report of the referee; and sustaining plaintiffs' motion to confirm and approve the report of the referee. Thereupon the trial court, sitting as a chancellor, entered a decree and judgment in favor of plaintiffs and against the defendant D'Oench, wherein it was adjudged and decreed by the court, *inter alia,* that ''this cause be dismissed as to defendant L. R. Powell; that plaintiff H. O. Neville have and recover out of the net available assets of said group of D'Oench-Neville the sum of $2,696.12; and that plaintiff R. L. Johnson have and recover out of the net available assets of said group of D'Oench-Neville the sum of $15,994.66.'' By the terms and provisions of said decree and judgment, Harry W. Castlen was appointed receiver to collect from the assets and funds of the said professional group, and from the defendant D'Oench, the pecuniary amounts respectively awarded to plaintiffs, Neville and Johnson; and the costs of the action, including allowances made to the referee and the receiver, respectively, were taxed against the plaintiffs, Neville and Johnson, and against the defendant D'Oench, share and share alike. After an unavailing motion for a new trial, the defendant D'Oench was allowed an appeal to this court.

The evidence adduced upon the trial before the referee, consisting of the oral testimony of the parties (much of which oral testimony has been reduced to narrative form in the printed abstract of the record), and comprising various documentary exhibits, records, books of account, audits and accountings, reflecting the method and manner of keeping the books of account, the distribution of expenses, and distribution of earnings, of the professional group, constitute a somewhat voluminous record. A scrutinous study and analysis of the entire record before us discloses that (as found by the referee) there is a sharp and irreconcilable conflict in the testimony of plaintiffs, on the one hand, and the defendant D'Oench, on the other hand, respecting the relationship which existed between the several individual parties during their occupancy of the suite

of rooms in the University Club Building in the period between February 1, 1919, and June 21, 1924, and respecting the oral understandings and agreements had between the individual parties as to the distribution of the joint gross earnings (during the aforesaid period) of the several individuals constituting the professional group, after deducting from such joint gross earnings the overhead office expenses of the professional group, and the cost of dental supplies used by the individual members of the professional group. It is uncontroverted by the testimony (as was found by the referee) that no written contract or agreement was entered into, by and between the parties, defining the nature of their relationship, their respective rights, and their respective liabilities. The personal testimony of plaintiffs tended positively to show an oral agreement between plaintiffs and defendant D'Oench, made and entered into on or about December, 1918, prior to the removal of the dental offices to the University Club Building, and thereafter confirmed by and between plaintiffs and defendant D'Oench, respecting the nature and character of their professional relationship, and their respective rights and liabilities, substantially as alleged in the petition. The defendant D'Oench, by his personal testimony, categorically and positively denied that any partnership or like relation existed between the parties, or any of them, and testified that he (D'Oench) alone was the sole and absolute owner and proprietor of the professional practice and business conducted during the aforesaid period in the suite of rooms in the University Club Building, and that the relation existing, during the aforesaid period, between defendant D'Oench and the other three individuals, constituting the professional group, was merely that of employer and employees. Neither of the plaintiffs claims to have had any agreements or understanding with defendant Powell, at any time, respecting the relation of the individuals constituting the professional group, and each of the plaintiffs so testified on the trial.

The defendant Powell testified that she had been engaged in Dr. D'Oench's office since January, 1911, in various capacities: first, as office girl; and thereafter, as laboratory assistant; and then, as an assistant to Dr. D'Oench at the dental chair; that witness graduated in dentistry in June, 1918; that, after the removal of the dental offices to the University Club Building in January or February, 1919, no change was made in the relation between witness and the other parties constituting the professional group; that her duties were those of an assisting dentist, laboratory work, supervising the bookkeeping of the dental offices, and "anything I could do to make myself helpful;" that she received a fixed salary, determined by Dr. D'Oench, which was paid twice a month, and which salary was increased from year to year; that her time was used by

Dr. D'Oench to such an extent that "I had very little time to do any other work;" that she never had had any conversations with either Dr. Neville or Dr. Johnson (plaintiffs) "regarding the conduct of the office, relationships in the office, or matters of business connected with the running of the office;" that she superintended the keeping of the books of account in the office under the personal direction of Dr. D'Oench; that she drew the checks for withdrawals of the funds of the professional group upon the direction of Dr. D'Oench; that checks evidencing Dr. D'Oench's personal withdrawals from the funds of the professional group were drawn at no regular times or intervals, but at times "when he (D'Oench) needed it;" that Dr. D'Oench never mentioned to witness "how he was operating the office, or business in relation to himself;" that "there was an understanding between Dr. D'Oench and me, when this new office (in the University Club Building) was started, in the event there was a surplus, I was to receive a proportion of that surplus;" that witness did not believe that she was present at any conversation "when Dr. D'Oench stated to any one else the proportion in which the surplus was to be divided;" that witness never had any understanding or agreement with Dr. D'Oench that she was to be permitted to draw fifty per cent of her individual gross earnings; and that witness could not recall that Dr. D'Oench had ever told her, in precise words, that "the office (or business) was his, and he was running the office," but that witness "had the impression" that Dr. D'Oench was "running the office."

On November 7, 1918, a written lease was executed by and between the University Club Building Company, as lessor, and Dr. H. F. D'Oench, as lessee, for a term ending on October 31, 1924, for the use and occupancy of a suite of ten rooms on the seventh floor of the University Club Building, as dental offices. Concurrently with the execution of said lease, a supplemental written agreement was made and executed by and between lessor and lessee, and which was attached to and made a part of the lease, providing that the lessee, Dr. D'Oench, shall pay the sum of $500, as his proportion of the costs and expenses of altering and completing the demised suite of rooms in accordance with the plans and specifications of the architects, and that Dr. D'Oench shall lend to the University Club Building Company, the lessor, the sum of $3,000 to provide funds for the lessor's proportion of the cost of completing said suite of rooms. The University Club Building Company covenanted and agreed with Dr. D'Oench to pay off and discharge said loan of $3,000, together with interest thereon at six per cent per annum, according to the tenor of 60 monthly installment notes of $50 each, plus the accrued interest on the then existing unpaid principal of the loan: said $50 installments, plus accrued interest, to be deducted from the accru-

ing monthly rents for the occupancy and use of the demised premises, until the whole amount of the said loan of $3,000, together with interest thereon, had been paid off and discharged.

The evidence further shows that, some time prior to February, 1919, the defendant D'Oench borrowed $7,000 upon his individual credit and the plaintiff Neville borrowed $3,000 upon his individual credit, which borrowed sums, aggregating $10,000, were deposited in January, 1919, as a fund in the International Bank of St. Louis to the credit and account of ''D'Oench-Neville.'' The original fund of $10,000 deposited as aforesaid was used for the purpose of loaning $3,000 to the University Club Building Company in accordance with the terms of the supplemental lease agreement, and in paying $500 as the lessee's agreed proportion of the cost of altering the demised suite of rooms in the University Club Building, and the balance of the fund was used to furnish and equip the suite of offices in the University Club Building with new and modern dental appliances and equipment, including an X-ray machine. Neither Dr. Johnson nor Dr. Powell contributed any amount to the original fund of $10,000. The $3,000 loaned to the University Club Building Company was afterwards paid off and discharged by the Building Company, and was credited to, and deposited in, the ''D'Oench-Neville'' account in the International Bank, and the $7,000 and $3,000, borrowed by D'Oench and Neville, respectively, were subsequently discharged and paid out of the net earnings of the professional group. From and after the opening of the ''D'Oench-Neville'' deposit account with the International Bank of St. Louis, the funds of the professional group were uniformly deposited in said bank account, and all checks drawn upon said bank account were signed either by plaintiff Neville, or by defendant D'Oench, but by neither Dr. Johnson nor Dr. Powell. Subsequently to the borrowing of the original $10,000 by Drs. D'Oench and Neville, individually and upon their personal credit, various amounts of money were borrowed at various times from banks in St. Louis in the name of ''D'Oench-Neville,'' and the promissory notes evidencing such indebtedness were signed, ''D'Oench-Neville, by H. F. D'Oench.'' According to the testimony of defendant D'Oench, ''these subsequent borrowings were for the sole purpose of taking up notes made in the incurrence of the original $10,000 of debts.''

Upon the removal of the dental offices to the University Club Building in January or February, 1919, the full names of the four individuals constituting the professional group were inscribed upon the entrance door of the suite of rooms. Billheads, and other office stationery, were uniformly used, bearing thereon the full names of the four individuals constituting the professional group. Such billheads and office stationery had not been used prior to the removal

to the University Club Building. Cards were uniformly used as mountings for the X-ray pictures taken in the office, bearing the printed inscription, "D'Oench-Neville X-ray Department, 709-14, University Club Building, Grand at Washington, St. Louis." A system of accounting and bookkeeping was inaugurated, reflecting the fact that rent, telephone, laundry, help, and other items of general overhead office expense were uniformly charged, share and share alike, against the four individuals constituting the professional group. The cost of dental supplies used was charged and prorated, at the end of each calendar year, against each of the four individuals constituting the professional group, in the proportions which the annual net earnings of each individual bore to the annual net earnings of the entire professional group. A daily card record was adopted and kept, beginning on the day of removal to the University Club Building, showing the names of the patients served by each of the four individuals constituting the professional group, the nature of the service rendered each patient, the charge made for each service rendered, and the individual dentist who rendered the service. Such daily record cards constituted the record of original entries, and were thereafter entered upon the books of account kept by the professional group. Patients, in most instances, were indiscriminately served by the four individuals constituting the professional group, although on occasions certain patients were assigned to, and served by, the particular dentist requested by the patient. Checks and remittances received from patients, in payment of services rendered, whether payable to an individual of the professional group, or whether payable to the group, were uniformly endorsed "D'Oench-Neville," and were uniformly deposited in the "D'Oench-Neville" account in the International Bank.

The evidence further shows that the business and practice of the professional group prospered, and no losses were suffered by the group at any time during the continuance of the group relation. So far as the evidence discloses, there was no understanding or agreement between any of the individuals constituting the professional group as to the distribution of losses, if such losses had been suffered. For the first year, or two years, after the removal to the University Club Building, the major portion of the surplus, or net earnings, of the professional group was used in paying off and discharging the original indebtedness of $10,000 incurred in connection with the opening of the suite of offices in the University Club Building, and in furnishing and equipping the suite with modern dental appliances. Each individual in the professional group was persuaded by Dr. D'Oench to keep his or her withdrawals from the group funds at a minimum amount, sufficient only to care for the living expenses of each individual. Meanwhile, the group funds

on deposit in the International Bank to the credit and account of "D'Oench-Neville" rapidly accumulated, and Dr. D'Oench conceived the plan of investing the accumulated earnings of the professional group in interest-bearing securities, consisting of selected stocks and bonds. Dr. D'Oench commenced investing the accumulated earnings in the purchase of such securities in April, 1920, and by December, 1922, the value of these securities amounted to the approximate sum of $20,000. A profit was realized through the purchase of such securities. In the year 1921, a distribution of a portion of the surplus earnings was made by Dr. D'Oench, who testified on the trial that he had used a "supposed capital" of $10,000, which he "arbitrarily fixed as a basis for distribution," which basis of distribution was as follows: six-tenths to Dr. D'Oench; three-tenths to Dr. Neville; one-tenth to Dr. Powell; and nothing to Dr. Johnson. Such basis of distribution of the surplus earnings continued until December, 1922, during which month and year distribution of the $20,000 in securities purchased from the accumulated earnings was made by Dr. D'Oench in the same manner, and upon the same basis of distribution. In the year 1923, the basis of distribution of surplus and accumulated earnings was changed by Dr. D'Oench,. who testified on the trial that "instead of using an hypothetical ten thousand dollars as the capital of the office, I used an hypothetical twelve thousand dollars," and the basis of distribution thereafter was: 6.6 parts to Dr. D'Oench, 3.3 parts to Dr. Neville, 1.1 parts to Dr. Powell, and 1. part to Dr. Johnson. The latter basis of distribution of surplus earnings of the professional group continued until June 20, 1924, when the present equitable action for an accounting was commenced by the plaintiffs, Neville and Johnson. All such distributions of surplus earnings, and of securities, were credited upon the books of the professional group, at the direction of the defendant D'Oench, . as "bonuses."

The referee reported to the trial court the following specific findings of fact:

"No .agreement in writing was entered into between the parties defining their rights and liabilities. There is an irreconcilable conflict between the oral testimony adduced by plaintiffs and that by defendants in respect to that part of their agreement whereby the profits of the business they proposed to engage in were to be divided. I am, therefore, driven to the necessity of relying upon not only the oral testimony, but what the parties did in fact, in order to determine their rights and liabilities. In this connection it is proper to say that the defendants not only denied the existence of a partnership, but that the defendant D'Oench claims to have been the originator and sole proprietor of the business conducted by the parties, and that, as between himself and the two plaintiffs and the

defendant Powell, the relation was somewhat like that of an employer and employee.

"It is relevant and somewhat helpful to briefly review the relation between the parties to this suit prior to February 1, 1919, in order to reach a correct conclusion as to what their relations were after that date.

"Hereafter referring to the parties by their professional names, whether plaintiffs or defendants, it appears that Dr. D'Oench had for some twenty-five or thirty years been in the active practice of dentistry, had acquired a high rank in the profession, and was enjoying a lucrative practice greater than he was able to fully attend to himself. That he was then one of the founders of the Dental Clinic in St. Louis, and was active in the management of its affairs. His office was located at Lafayette and Nebraska Avenues, this city.

"In 1907, Dr. Neville, having become a graduate dentist, secured office space with Dr. D'Oench. He then had a small but growing practice, and paid Dr. D'Oench for the privilege of occupying a part of the latter's office by laboratory work, and also, in addition to treating his own patients, treated some from time to time turned over to him by Dr. D'Oench, when the latter had more than he could do.

"Dr. Powell then, or sometime later, also became connected with the office and business of Dr. D'Oench in the capacity of an office-girl, performing various duties as such, including keeping Dr. D'Oench's books, and later was graduated from a dental school, and on February 1, 1919, was authorized to practice dentistry. Some time after 1907, the offices of Dr. D'Oench were removed to Lafayette and Grand Avenues, occupied and used as the former one had been, with the exception that Dr. Neville paid money rent to Dr. D'Oench for the space and accommodations which he there had. At this time Dr. Neville's practice had grown considerably. In 1917, Dr. Johnson having graduated from a dental school some time prior thereto, and having an office somewhere on Shenandoah Avenue, sought an introduction to Dr. D'Oench, to whom he made application and was granted room and other facilities to practice his profession, where he attended his own patients, also some sent to him by Dr. D'Oench, and through the influence of Dr. D'Oench was also given employment by the dental clinic and paid a monthly salary by the clinic, but not by Dr. D'Oench. He was thus enabled to earn a modest livelihood through his association with Dr. D'Oench. Dr. Powell was paid a regular monthly salary by Dr. D'Oench.

"Sometime about December, 1918, Dr. D'Oench originated a plan looking to the removal of the offices occupied at Lafayette and Grand Avenues to the University Club Building, then nearing completion, of which he was the prime mover, and Drs. Neville, John-

son and Powell agreed to go with him. During negotiations looking to the proposed removal, Dr. D'Oench stated that they would work together in the new location as a *group* and on a different basis from that which then prevailed. The parties then and continuously thereafter referred to themselves as a *group* engaged in the practice of dentistry. The contemplated plan for removal required the use of about $10,000. Dr. D'Oench agreed to, and did, raise upon his own individual credit $7,000, and Dr. Neville in like manner raised $3,000. Neither Dr. Powell nor Dr. Johnson contributed to this fund. It was agreed that a bank account should be opened in the name of 'D'Oench-Neville' with the International Bank of St. Louis, where this fund of $10,000 was deposited to their credit, and was used as follows:

"About $500 to pay for some alterations in the original plan of the University Club Building in order to make the suite of offices which the group intended to occupy better adapted to their purposes; $3,000 of the fund was loaned to the University Club Building Company pursuant to the terms of a lease of the offices taken in the name of Dr. D'Oench as lessee, and the balance was used in the purchase of new and modern equipment. On removal from the offices at Grand and Lafayette Avenue, each of the parties took his own individual equipment, much of which after removal was turned in in part payment for new equipment, and when the new suite of offices in the University Club Building had thus been equipped, the group had complete and modern appliances, including an X-ray machine, for conducting the practice of dentistry in their new location most advantageous to each of them, especially in view of the fact that the overhead expenses were, in fact, to be paid by each, share and share alike, except dental supplies which were charged to each individual of the group in the amount actually used by him. The group did not adopt a partnership name, but on billheads and other literature the individual names of each appeared. Dr. Johnson continued his employment with the dental clinic for a short time, until his practice grew to a point where it required his entire time; his work in the clinic was not paid for out of the income of the group, but by the clinic. The books and records were so kept under the general direction of Dr. D'Oench with the supervision of Dr. Powell, as to show the gross income from year to year for services performed by each member of the group, and all money collected for services by members of the group were deposited to the credit of 'D'Oench-Neville' in the International Bank, subject to check by either Dr. D'Oench or Dr. Neville, or both, but was usually withdrawn on the checks of Dr. D'Oench. In addition to income from services, there was interest earned on investments made by Dr. D'Oench out of the common fund, also income from the operation of an X-ray ma-

chine, which is claimed by Dr. Neville because he took all, or nearly all, of the X-rays required by patients treated by all members of the group, including his own, and for which he received no individual credit on the books.

"On or about February 1, 1919, as already stated, the new offices in the University Club Building were ready for occupancy, were equipped with modern and first-class appliances for the practice of dentistry, and the so-called group moved in, each of whom not only treated his own patients, but, by interchange, those of others, so that the group functioned as a whole, but each made an individual record of work done by himself, for which he was given credit, but whether services to any one patient were performed by one only or more members of the group, they were included in one bill to the patient which, when paid, was deposited in the common fund. In the beginning it was agreed, according to the testimony of plaintiffs, that each member of the group should receive as a drawing account for his personal use not to exceed fifty per cent of his gross earnings, the balance to be reserved to cover overhead expenses and repayment of the $10,000 loan, and a set of books were opened, in which a record was kept of the receipts and disbursements of moneys both earned and borrowed by the group, to which further reference will be made.

"The gross income of the group apparently exceeded their expectations, and out of the fifty per cent thereof reserved, they had not only, prior to December 31, 1920, paid current overhead expenses, but also repaid the $10,000 loan and interest thereon borrowed on the credit of Drs. D'Oench and Neville. The $3,000 of this sum loaned to the University Club Building Company was repaid to the group prior to December 31, 1923 and $6,994.40 had been invested in equipment. As early as the year 1920, and to and including the year 1923, Dr. D'Oench, without the previous knowledge or consent of the plaintiffs, used money belonging in the reserve fund, not needed to pay overhead expenses, to purchase interest-bearing securities, and to thus keep on hand a fund to meet possible future contingencies in addition to the amount necessary to pay such expenses. He at one time had on hand as much as $20,000 par value of such securities, and having concluded there was no longer any necessity for thus using money taken from the reserve fund, he made a distribution thereof to other members of the group and himself, in unequal amounts, having no percentage relation to the earnings of each. Dr. D'Oench characterized this distribution as a 'bonus,' and so had it entered on the books.

"The purchase of securities thus made did not result in any loss to the reserve fund; on the contrary, there was a profit resulting, both from interest paid and increased market value. When

Dr. D'Oench handed to Dr. Neville the part allotted to the latter, he was asked for some explanation, which Dr. D'Oench then failed to give, but promised later. The purchase and distribution of these securities by Dr. D'Oench has no particular significance in this case other than disclosing his attitude and frame of mind toward other members of the group.

"On some undisclosed date in 1919, Dr. D'Oench informed Drs. Neville and Johnson that he had admitted Dr. Powell to membership in the group, upon the same terms then existing between himself and them, but no particular mention was then made in detail as to what those terms were.

"Drs. Neville and Johnson accepted Dr. D'Oench's statement without any confirmation thereof by Dr. Powell. Her relations to the group are only disclosed by her own testimony and by what they did.

"In 1919, the average monthly gross earnings of Dr. Neville from services was approximately $325 per month, and those of Dr. Johnson $200 to $220 per month.

"In June, 1924, the average earned by Dr. Neville had increased to about $800 per month, and that of Dr. Johnson to about $900 per month.

"Both had become much dissatisfied with the manner in which Dr. D'Oench, as fiscal agent of the group, was handling its funds, but particularly as to the amounts distributed to each of them out of his net earnings. This resulted in a personal conference between them early in June, 1924, during which Drs. Neville and Johnson demanded a settlement of the affairs of the group, based upon the terms and conditions of the contract alleged in the petition, which were then specifically called to the attention of Dr. D'Oench, who denied that he had entered into any contract with other members of the group upon the terms and conditions claimed by Drs. Neville and Johnson, or that he had any recollection thereof. On the contrary, he claimed in effect that he was the proprietor of the business carried on by the group; that he had a right to control its affairs as if its equipment and funds were his own, and that Drs. Neville and Johnson had already received a just and fair compensation for their services as members of the group.

"This was the first time, so far as disclosed by the evidence, that Dr. D'Oench specifically claimed proprietorship of the business conducted by the group.

"In 1921, Dr. D'Oench directed the distribution of $1,000 out of the surplus earnings of the group on the basis of six, three and one, of which Dr. D'Oench took $600, Dr. Neville was given $300, Dr. Powell $100, but none to Dr. Johnson.

"In the distribution of surplus made in 1923, as directed by Dr. D'Oench, he took 6.6 parts, Dr. Neville was given 3.3 parts, Dr. Powell 1.1 parts, and Dr. Johnson 1 part.

"These distributions, as entered on the books, were called *bonuses*.

"Dr. Powell testified that, while working with the group, her gross earnings went into the common fund; that she was paid a fixed salary per month, which was increased from time to time; and that she never had any agreement or understanding with Drs. Neville and Johnson, or either of them, as to the terms and conditions upon which the group was to function. In giving her testimony, she expressed satisfaction with the sums paid her as salary while working with the group, and apparently has no claim against other members thereof to be liquidated in this proceeding. Furthermore, she is not in possession or control of any property or money which belonged to the group. A commendable effort was made by the parties, other than Dr. Powell, to compromise and settle their differences without resort to litigation, which failed, resulting in the commencement of this suit June 20, 1924.

"On June 23, 1924, the parties entered into a stipulation, which appears in full on pages 3 to 8 both inclusive, of volume 1 of the transcript of evidence, whereby they agreed, among other things, that all moneys collected prior to June 21, 1924, for dental services, would be paid into the common fund to the credit of 'D'Oench-Neville;' that the current overhead expenses for June, 1924, should be paid out of that fund, but to otherwise remain undisposed of pending the determination of this suit; that Drs. Neville and Johnson should have use of the offices until they could find another location, but not longer than until August 1, 1924, and that the parties would no longer function as a group, but would each practice on his own account. All was done as agreed upon.

"They also agreed that Drs. Neville and Johnson might select and take, upon leaving, such part of the equipment that was owned and furnished by them on removal from Grand and Lafayette Avenue, which they did, and that the rest of the equipment paid for out of the common fund should remain in possession of Dr. D'Oench, to be accounted and paid for by him at its appraised value, if so ordered, on final determination of this suit.

"At the time this suit was begun, all moneys borrowed on the credit of Drs. D'Oench and Neville to finance the group in the beginning had been repaid with interest out of their common fund; all new equipment that had been purchased, and all overhead expense, had been paid for in like manner, share and share alike, except current expenses only for the month of June, 1924. As shown by plaintiffs' Exhibit J, an appraisal of the dental office furnishings in the University Club Building was made at the request of Dr. D'Oench as of Au-

gust 1, 1924, and after the removal of Drs. Neville and Johnson, from which it appears that the replacement value was $8,661.95 and the sound value was $6,296.43. No question is raised as to the correctness of this appraisal. It shows a depreciation of $2,365.52. Exhibits D and K offered in evidence by plaintiffs reflect the financial transactions of the group as shown by their books and records. 'D' was prepared at the request of Dr. D'Oench, upon the basis of proprietorship, to-wit: That he was the sole owner of the business. 'K' was prepared at the request of Drs. Neville and Johnson, upon the basis of a partnership relation between members of the group, and as if separate individual accounts had been kept with each member thereof in which he had been credited with the gross amount of his dental services, his pro rata share of interest, X-ray and other income earned, and charged with his share of overhead expense, repayment of $10,000 loan and amounts distributed to him from time to time denominated in Exhibit 'D' as either *'salary'* or *'bonus.'* The actual work of preparing these two exhibits was performed by Otto W. Noll, a certified public accountant and a witness in this case, although 'D' purports to be certified by Ernst & Ernst, certified public accountants.

"No question is raised as to the accuracy of the figures appearing in these two exhibits, leaving open the question which of the two more correctly reflects what the parties did, or intended to do. Income from interest and X-Ray service is prorated in 'K' under column 'Gross Income' to the several parties.

"Plaintiffs' Exhibit M shows that on July 16, 1924, there was on deposit with the International Bank to the credit of 'D'Oench-Neville,' $4,785.32. At the request of the Referee, the International Bank has balanced this exhibit as of February 18, 1926, showing a balance of $4,708.49 then standing to the credit of 'D'Oench-Neville.'

"From an analysis of Exhibits D and K, it appears that the total net income from dental services, interest earned and X-ray services of each member of the group, after repayment of the $10,000 loan and interest thereon, and all overhead expenses, except those for the month of June, 1924, in equal shares, and the total amount paid to each other as so-called 'salary' or 'bonus,' was on June 21, 1924, as follows:

*Dr. D'Oench:*
"Total amount net income .........................$54,834.70
Amount received by him as salary or bonus ............ 67,122.00
Excess of receipts ................................. 12,287.30

"*Dr. Neville*:

"Total amount net income ........................\$33,494.50
Amount received by him as salary or bonus .......... 30,207.00

Balance due ....................................\$3,287.50
"*Dr. Powell*:
"Total amount net income ........................\$18,126.13
Amount received by her as salary or bonus ........... 13,989.39

Balance due ....................................\$4,136.74
"*Dr. Johnson*:
"Total amount net income ........................\$28,796.11
Amount received by him as salary or bonus .......... 12,210.07

Balance due ....................................\$16,586.04

"I have checked Exhibits D and K, one against the other, and find the above figures to be correct, although no question was raised as to their correctness on the trial.

"There is no evidence showing, or tending to show, any agreement or understanding between the members of the group as to the length of time during which they would continue to work together as such.

"While Dr. Neville claims that he did all, or nearly all, of the X-ray work, amounting to over \$15,000, there is no basis in the evidence upon which to award him particular credit for the whole thereof, but on the contrary it appears the total amount was kept in a separate account, and, like interest earned, was prorated to each member of the group as shown on Exhibit K, a part of the plaintiffs' evidence. A number of exhibits other than those specially mentioned above were offered in evidence, the probative force of which is reflected in those so mentioned, except duplicate copies of Dr. D'Oench's income tax returns, offered in proof of the existence of a partnership between members of the group. A critical examination of them since the hearing leads me to conclude that these duplicate returns do not tend to prove the existence of the alleged partnership, and I, therefore, reject them as evidence in this case."

The referee reported to the trial court the following "Findings of Fact and Law," upon which findings the referee recommended to the court that a decree be entered:

"1. I adopt, without repetition, the facts specifically found to exist in the foregoing statement.

"2. I find, as a matter of law, that either one or more members of the so-called *group* had the right, on June 20, 1924, to elect to dissolve the agreement under which they had theretofore been operating, to demand from other members of the group an accounting, and, if

necessary, to institute this suit in equity to enforce such accounting.

"3. I find, as a matter of law, that the agreement entered into between plaintiffs and the defendants, and the transactions thereunder, do not constitute a partnership in any technical legal sense as between them, and this is especially true as to the relation of the defendant Dr. Powell to the group. The evidence, considered as a whole, does not disclose a common intent by plaintiffs and defendants, or by plaintiffs and defendant Dr. D'Oench, to become bound in an agreement of co-partnership.

"4. I find, as a matter of law, that the agreement which they in fact entered into was a joint venture, in which the cost of overhead expense and equipment of a suite of offices for their common use, was to be borne share and share alike, thus minimizing the expense to each, but otherwise each member of the group was to practice dentistry upon his own account and to receive and enjoy the net income from his own practice.

"5. I find, as a matter of law and fact, that the defendant D'Oench was not the sole owner, and entitled to control the distribution of the net income of the group, so as to pay each other member thereof for services a sum or sums less or more than the respective amounts of the net income derived from his or her services.

"6. I find, as a matter of law, in the absence of any specific agreement whereby each member of the group should be paid more or less than the net income produced by his services, that each would be entitled to as much, but no more or less, than his net income.

"7. Considering Dr. D'Oench's long career and high standing as a dentist, and his conception and dominant part in the organization of the group, it would not have been unreasonable for him to have stipulated for the payment to himself of a bonus out of the net income of the group before distribution of the remainder, even though the organization was beneficial to all members thereof alike, but the evidence does not establish the existence of any such stipulation.

"8. I find, as a matter of law and fact, that each member of the group had a common, if not a joint, interest in the property and funds acquired by the group during its operations, and that for this reason the plaintiffs are entitled to maintain this suit for an accounting under the authority of Breimeyer v. Bottling Company, 136 Mo. App. 84; Ballew Hdw. Co. v. Mo. Pac. Ry. Co., 288 Mo. l. c. 478.

"9. I find, as a matter of law, since the defendant Dr. Powell makes no claim for an accounting, either as against the plaintiffs, or as against her co-defendant Dr. D'Oench, and disclaims any interest in the property and money still belonging to the group, that this suit should be dismissed as to her,

"10. As heretofore stated, I find, as a matter of fact, that the defendant Dr D'Oench has drawn out of the common fund belonging to the group the sum of $12,287.30, in excess of his net income; that the plaintiff Dr. Neville is still entitled to a balance of $3,287.50 out of his net income; that the defendant Dr. Powell would be entitled to a balance of $4,136.74, if treated as a member of the group and she had made any claim therefor; and that the plaintiff Dr. Johnson is entitled to a balance of $16,586.04 out of his net earnings.

"11. I find, as a matter of fact, that there has been a depreciation in the value of the dental office furnishings paid for out of the common fund of the group in the sum of $2,365.52, and that this depreciation should be charged back, share and share alike, against the balances, either due or overpaid, to members of the group, thus reducing the amount overpaid to the defendant Dr. D'Oench to the sum of $11,695.92, reducing the unpaid balance due to the plaintiff Dr. Neville to $2,696.12, reducing the balance apparently due to the defendant Dr. Powell to $3,545.36, and reducing the balance due to plaintiff Dr. Johnson to $15,994.66.

"12. I find that the net available assets belonging to the group out of which the balances due the respective plaintiffs mentioned above and aggregating the sum of $18,690.78 can be paid, consist of the following:

"(a) Dental office furnishings of the sound value of $6,296.43, as shown by Plaintiffs' Exhibit J, which are now in possession of the defendant Dr. D'Oench and which, under the stipulation appearing on page 6, volume 1, of the transcript of evidence, he has agreed to account for, with interest from June 21, 1924, now aggregating the sum of $6,926.07.

"(b) Money now on deposit with the International Bank in St. Louis to the credit of 'D'Oench-Neville' amounting, with bank interest, to the sum of $4,708.49.

"(c) And a refund by defendant Dr. D'Oench of the sum of $7,056.22 of his excess withdrawals out of the common fund of the group over and above his share of net profits.

"I recommend that a decree be entered herein (1) dismissing this suit as to the defendant L. R. Powell; (2) finding the issues otherwise joined in favor of plaintiffs, and against the defendant H. F. D'Oench, except the issue as to whether or not a technical relation of partnership was agreed to by the parties, as to which issue a finding in favor of defendant H. F. D'Oench; (3) that the plaintiff H. O. Neville is entitled to have and recover out of the net available assets of the group the sum of $2,696.12; (4) that the plaintiff R. L. Johnson is entitled to have and recover out of the net available assets of the group the sum of $15,994.66; (5) that a receiver be appointed herein with authority to collect from the defendant H. F. D'Oench

the sum of $6,926.07, the present value of assets now in his hands consisting of dental office furnishings, also the sum of $7,056.22, being part of the $11,695.92 overpaid to him out of the net earnings of the group, and the sum of $4,708.49 now on deposit with the International Bank in St. Louis to the credit of 'D'Oench-Neville;' (6) and further, that defendant H. F. D'Oench be ordered to pay to such receiver the said sums of $6,926.07 and $7,056.22 respectively, and that he and the plaintiff H. O. Neville issue their joint check payable by said bank to the order of such receiver for the said amount deposited therewith, to-wit: $4,708.49; and that, when so collected, he disburse the amount received by paying H. O. Neville $2,696.12, and R. L. Johnson $15,994.66, the plaintiffs herein.''

The decree and judgment of the trial court substantially follows the recommendations and findings of the referee, except that the trial court makes the following specific findings:

''First. That the defendant, L. R. Powell, has made no claim for accounting, either against the plaintiffs or against her co-defendant, H. F. D'Oench.

''Second. That the defendant, H. F. D'Oench, was not the sole owner and entitled to control the distribution of net income of the group of said D'Oench-Neville so as to pay each other member of D'Oench-Neville, for his or her service, a sum or sums less or more than the respective amounts of the net income derived from his or her services.

''Third. That the agreement entered into between the plaintiffs and defendant D'Oench, and the conduct and transaction thereunder, disclose that the plaintiffs and defendant D'Oench were *partners in a joint venture* in which the costs of overhead expense and equipment of a suite of offices for their common use was to be borne share and share alike, thus minimizing the expense of each of said group of D'Oench-Neville; the liability of each member of the group for the debts of such joint venture was to be borne out of the funds of said group, D'Oench-Neville, and each member of said D'Oench-Neville was to practice dentistry upon his or her own account and to receive and enjoy the net income from his or her own practice.

''Fourth. That either one or more of the members of said group of D'Oench-Neville had the right, on June 20, 1924, to elect to dissolve the agreement under which the members of D'Oench-Neville had heretofore been operating, and to demand from other members of the group an accounting, and that each member of the group of D'Oench-Neville had a common, if not a joint, interest in the property and funds acquired by the group during their operations, and that, by reason of this fact, plaintiffs are entitled to maintain this action for an accounting.

"Fifth. That defendant D'Oench has drawn out of the common fund, belonging to said group of D'Oench-Neville, $12,287.30 in excess of his net income; that plaintiff H. O. Neville is still entitled to a balance of $3,287.50; that the defendant L. R. Powell would be entitled to a balance of $4,136.74, if any claim therefor was made by her to said amount; and that the plaintiff R. L. Johnson, is entitled to a balance of $16,586.04.

"Sixth. The court further finds that there has been a depreciation in the value of the dental office furnishings of the group of D'Oench-Neville in the sum of $2,365.52, and that this amount of depreciation should be charged back, share and share alike, against the balances, either due or overpaid, to members of the group of D'Oench-Neville, thus reducing the amounts overpaid to defendant D'Oench to the sum of $11,695.92, reducing the unpaid balance due to the plaintiff H. O. Neville to $2,696.12, reducing the balance due to defendant L. R. Powell to $3,545.36, if claimed by her, and reducing the balance due to plaintiff R. L. Johnson to $15,994.66."

The appellant, D'Oench, presents nine separate assignments of error, which, however, may be grouped and ruled as three assignments, viz.: (1) the trial court erred in finding that a partnership relation existed between plaintiffs and defendants; (2) the trial court erred in confirming and approving the referee's report, thereby implying a contract between the parties as a matter of law, and thereby failing to find and rule that a contract respecting the method and basis of distribution of the net earnings of the professional group should be inferred in fact from the conduct and continuous course of dealing of the parties; and (3) the trial court erred in sustaining plaintiffs' motion to strike defendants' amended answer from the files. We will discuss and rule the three assignments of error in the order as stated above.

I. Error is assigned in the finding and conclusion of the trial chancellor that "the plaintiffs and defendant D'Oench were partners in a joint venture." Such finding and conclusion of the trial chancellor differs only in slight degree from that of the  referee, who found, as a matter of law, that "the agreement entered into between plaintiffs and the defendants, and the transactions thereunder, do not constitute a partnership in any technical legal sense as between them; . . . and that the agreement which they in fact entered into was a joint venture, in which the cost of overhead expense, and equipment of a suite of offices for their common use, was to be borne share and share alike, thus minimizing the expense to each, but otherwise each member of the group was to practice dentistry upon his own account and to receive and enjoy the net income from his own practice." It was strenuously

contended by the defendant D'Oench, throughout the trial of the action before the referee, and before the trial chancellor upon the hearing of the defendant's exceptions to the referee's report, that he (D'Oench) was the sole and absolute owner, or proprietor, of the business and practice of the professional group, and that the relation between himself and the other persons constituting the professional group was merely that of employer and employees. The findings of both the referee and the trial chancellor were against such contention of the defendant D'Oench, being to the effect that "the defendant D'Oench was not the sole owner, and entitled to control the distribution of the net income of the (professional) group."

As we view the issue of the relation existing between plaintiffs and defendants, it matters little, or nothing, whether such relation be denominated and characterized as a partnership, or as a joint adventure. A "joint adventure" has been aptly defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." [33 C. J. 841.] In comparing and distinguishing the relations of joint adventure and partnership, it is said in 33 Corpus Juris, 841, 842: "A joint adventure as a legal concept is of comparative recent origin. It is purely the creature of our American courts. At common law an enterprise of a limited character, such as is now called a joint adventure, was regarded in law as merely an informal kind of partnership, and the courts made no attempt to distinguish the one from the other. Such is still the case in England and in Canada; but in the United States the courts, about the middle of the last century, began to find it convenient to draw a distinction between them, and hence there is gradually building up a body of American law applicable to the relation of joint adventures which may or may not apply to the relation of partners. So far the divergence between the two relations is very slight; so slight in fact that it is generally asserted that they are governed by the same rules of law. This is true as regards substantial rights, especially those enforceable in courts of equity; but there is a very marked difference between the attitude of courts of law as respects the two relations, for whereas these courts will not assume to redress grievances between partners, they will lend their aid in controversies between mere joint adventurers, and will hear and determine actions wherein one of them sues his associate for breach of contract, or for a share of the profits, or losses of the venture, or for contribution for advances made thereto, notwithstanding courts of equity still retain jurisdiction in these matters."

It is the settled law that a contract of joint adventure, or of partnership, need not be established by showing an express agreement of the parties, that such a contract may be implied and inferred, in whole, or

in part, from the acts and conduct of the parties. [33 C. J. 847; 47 C. J. 649; Knapp v. Hanley, 108 Mo. App. 353, 361; Hudson v. French, 211 Mo. App. 175, 181.] In 33 Corpus Juris, 844, it is said: "Reported cases are of scant benefit in determining whether the parties to a contract sustain the relation of joint adventurers or employer and employee, since in the final analysis the facts of each case must determine the question. . . . If the person rendering the services is himself the promoter or an original party to the enterprise, he has usually been held to have an interest therein as joint adventurer with the others, and especially so if he himself contributes capital to the enterprise."

The documentary evidence, including the books of account of the professional group, adduced on the trial before the referee, establishes beyond dispute that the four individuals constituting the group were uniformly charged, share and share alike, with the general overhead expenses of the group, such as office rent, telephones, clerical hire, laundry, and similar items; and that the cost of all dental supplies used was also charged and prorated against the four individuals constituting the group, in the proportions that the annual net earnings of each individual bore to the annual net earnings of the entire group. Such system of accounting and bookkeeping, which was concededly (by his own testimony) inaugurated by the defendant D.'Oench, and which was under his immediate personal supervision and direction, to our minds, is utterly and wholly incompatible with the contention of the defendant D'Oench, made throughout the trial, that he was the sole and absolute owner of the professional business and practice, and that the relation existing between himself and the other individuals constituting the professional group was merely that of employer and employees. If, as contended by defendant D'Oench, the relation between him and the other individuals of the group was merely that of employer and employees, it would appear to have been a wholly useless gesture to have charged and assessed the other individuals constituting the group, as mere employees of D'Oench, with any part of the general overhead expenses of the professional practice or business, or with the cost of dental supplies used by them individually in the furtherance of the business and practice of D'Oench, as a mere employer. The elaborate and intricate system of accounting which uniformly prevailed throughout the entire period of the group relation (more than five years) would have been wholly unnecessary and useless had the defendant D'Oench deemed himself to be the sole and absolute owner of the professional business and practice of the group, and to be the mere employer of the other three individuals of the group. The documentary evidence alone, evidencing the acts and conduct of the parties, tends strongly, if not conclusively, to warrant and support the findings and conclusions of both the referee and the trial chan-

cellor that a joint relation existed between the four individuals constituting the group, whether such relation properly may be denominated as a technical partnership, or as a joint adventure. The findings and conclusions of both the referee and the trial chancellor are amply and substantially supported by the evidence in the cause, and we find no reversible error therein.

Whether the joint relation of the parties, which we find and hold to be amply shown and established by the evidence, be denominated as a partnership, or as a joint adventure, each individual member of the professional group was entitled to share in the profits derived from such joint relation and enterprise, and to maintain an action in equity for an accounting and distribution of the profits. [47 C. J. 789, 803; 33 C. J. 861, 867.]

In 33 Corpus Juris, 861, 862, the equitable principle is thus clearly stated: ''Since each member of a joint adventure, by virtue of his contribution to the capital invested therein, or by the performance of services in connection therewith acquires an interest in the property and business of the enterprise, it follows as a necessary consequence from the character of the undertaking that he is entitled to share in the profits derived therefrom. . . . The right to share in profits necessarily implies a duty upon the part of the member having the possession or control of them to account to the other members and to pay over to each his proportionate share, and the performance of this duty can be enforced by appropriate action.''

II. Notwithstanding the single theory of appellant D'Oench, strenuously urged and adhered to throughout the trial before the referee, and at the hearing upon the exceptions to the referee's report had before the trial chancellor, namely, that D'Oench was the sole and absolute owner of the practice and business of the professional group, and, therefore, that D'Oench, as sole owner, had the absolute right to arbitrarily control and determine the manner and basis of distribution of the net earnings and income of the professional group (under the contended relation of employer and employees), the appellant now urges upon appeal that the evidence herein (to quote the language of his brief) ''compels the conclusion that, with the acquiescence of all of the parties, a consistent method of distribution of the earnings of the office was maintained during the entire period of the business association of plaintiffs and defendants, and this consistent mode of dealing defined and evidenced the (real and actual) understanding of the parties and constituted their contract; our contention is that this course of conduct over such period of time establishes what the contract was, and that the parties are entitled to distribution on this basis, and on no other.'' Arguing from the afore-

quoted premise, the appellant, D'Oench, urges that the referee and the trial chancellor erred in their findings and conclusions, in that the referee and the trial chancellor, by their findings and conclusions, attempted to make a contract for the parties by implication of law, whereas the contract between the parties is defined by, and must be inferred from, the course of dealing between the parties as respects the distribution made of the net earnings of the professional group during the period of their association.

In support of his contention and assignment of error, appellant cites State v. Christopher, 318 Mo. 225, 239, and Weinsberg v. St. Louis Cordage Co., 135 Mo. App. 553, 565.

The Christopher case, supra, was a prosecution of the defendant, Christopher, for violation of a statute of this State which makes it a misdemeanor for any person to keep an office, store or other place where is permitted pretended buying and selling of stocks, grain and other products without any intention of receiving or paying for the property so bought, or delivering the property so sold. The form of printed contract used by defendant Christopher, in making, for the account of his customers, purchases of grain on margins, specifically provided that "all transactions made by us for your account contemplate the actual receipt and delivery of the property, and payment therefor." The cause was tried and submitted upon an agreed statement of facts, wherein it was stipulated and agreed by defendant, Christopher, that there was no actual physical delivery made of the grain purchased by defendant's customers, and that defendant's customers intended that there was no actual physical delivery of the grain purchased. We ruled therein that the contract entered into by the defendant with his customers, although specifically reciting upon its face that an actual delivery of grain was contemplated, was to be construed in the light of the stipulated facts, namely that there was no actual physical delivery made of the grain purchased by the defendant's customers, and that defendant's customers intended that there was to be no actual physical delivery of the grain. In so ruling, this court remarked in the Christopher case: "Contracts are construed as they are understood and acted upon by the parties to them." The appellant, D'Oench, in the instant case, calls to his aid the foregoing language as used and applied by this court in the Christopher case.

The Weinsberg case, supra, was an action brought by the plaintiff, a physician and surgeon, for the recovery of compensation for surgical services rendered by plaintiff in performing an operation upon an employee of the defendant corporation, injured in defendant's manufacturing plant, which services were rendered by plaintiff at the instance and request of the president of the defendant corporation. It was contended by the defendant therein that the cause was

one wherein the law declines to imply a contract, wherefore it devolved upon the plaintiff to establish by his proof an express contract with the defendant corporation, failing in which plaintiff was not entitled to recover compensation for his services. The St. Louis Court of Appeals, after reviewing the evidence, ruled that the contract had been amply and substantially established as a matter of fact, although the contract was not express in all its details. Said the Court of Appeals, speaking through NORTONI, J. (135 Mo. App. l. c. 565): "However, we do not understand that, because there was no express promise, it follows there may not be an actual contract, as distinguished from one implied by law. Although the law will not imply one if there be an actual contract, it need not be expressed. [Morrell v. Lawrence, 203 Mo. 363, 373.] It appears the court found not only that the president requested the services, but that he intended the defendant should pay therefor. It conclusively appears the plaintiff intended to charge. In these circumstances, the fact of a contract between the parties is established by the testimony."

We do not question the principles of law announced in the foregoing cases, cited by appellant in support of his assignment of error but we do not find the conclusions and findings of the referee and the trial chancellor to be in contravention of the principles of law announced in the cited cases. A close reading and analysis of the findings and conclusions of the referee and the trial chancellor, in their entirety and as a whole, leads us to the conclusion that the referee and the trial chancellor have not attempted to make a contract for the parties by implication of law, but that the referee and the trial chancellor, from the personal testimony of the parties and from all the facts and circumstances in evidence, including the acts and conduct of the parties, found the existence of a contract between the parties as a matter of fact.

The premise of appellant's argument and contention, to the effect that, "with the *acquiescence of all* of the parties, a consistent method of distribution of the earnings of the (dental) office was maintained during the entire period of the business association of plaintiffs and defendants," is not supported by the testimony of plaintiffs, and is in direct conflict with the testimony of plaintiffs. Both plaintiffs testified quite positively that neither of them had *acquiesced* in the method and basis of distribution of the net earnings of the professional group, as arbitrarily determined and made by the defendant D'Oench, and that each had repeatedly asked Dr. D'Oench to make an explanation of the basis of distribution of the net earnings, or income, of the group, which explanation Dr. D'Oench had promised to make some time later, but which explanation Dr. D'Oench never made to either of plaintiffs until the time of the dissolution of the group relation, when for the first time, according to plaintiffs' evi-

**64**

dence, Dr. D'Oench claimed to be the sole and absolute proprietor of the professional business and practice of the group. The express findings of the referee as to the fact of plaintiffs' acquiescence in the basis of distribution of the net earnings of the group is thus clearly stated in the referee's report: "Both (plaintiffs) had become much dissatisfied with the manner in which Dr. D'Oench, as fiscal agent of the group, was handling its funds, but particularly as to the amounts distributed to each of them out of net earnings. This resulted in a personal conference between them early in June, 1924, during which Drs. Neville and Johnson (plaintiffs) demanded a settlement of the affairs of the group, based upon the terms and conditions of the contract alleged in the petition, which were then specifically called to the attention of Dr. D'Oench, who denied that he had entered into any contract with other members of the group upon the terms and conditions claimed by Drs. Neville and Johnson, or that he had any recollection thereof. On the contrary, he (Dr. D'Oench) claimed in effect that he was the proprietor of the business carried on by the group; that he had a right to control its affairs as if its equipment and funds were his own, and that Drs. Neville and Johnson had already received a just and fair compensation for their services as members of the group. This was the first time, so far as disclosed by the evidence, when Dr. D'Oench specifically claimed proprietorship of the business conducted by the group."

While the referee found that "there is an irreconcilable conflict" in the testimony of the parties in respect to that part of their agreement or contract having to do with the method and basis of distribution of the net profits of the group, nevertheless the credibility of the witnesses and of their testimony was, in the first instance, at least, a matter for the determination of the referee, who reported his findings of both fact and law to the trial chancellor, which report of the referee was approved and confirmed by the trial chancellor, after a review of the evidence adduced on the trial before the referee, and after a full hearing of defendants' exceptions to the referee's report. While, on appeal of equity cases, this court has always reserved to ourselves the right to review the whole evidence, in order that we may weigh and decide *de novo,* and thereby do equity, nevertheless we have ofttimes said that, in equity cases involving close questions of fact, and where the evidence is conflicting, deference should be given by us to the findings of the trial chancellor. [Pfotenhauer v. Ridgway, 307 Mo. 529, 536; Huffman v. Huffman, 217 Mo. 182, 192.] And our rule of practice in equity cases operates with peculiar force where, as in the instant case, the determination of an issue of fact rests largely upon the credibility of witnesses. [Creamer v. Bivert, 214 Mo. 473, 480; Keener v. Williams, 307 Mo. 682, 705.] The rule operates with added and greater force in an appellate court, when the

findings of a referee have been approved by the court or chancellor below. [23 R. C. L. 299, and cases there cited; Davis v. Schwartz, 155 U. S. 631, 636.]

Although we are disposed to accord deference to the findings of the referee and the trial chancellor herein, an examination on our part of the entire evidence in the cause leads us to the same findings of fact and conclusions of law. The course of conduct of the professional group; the manner in which they held themselves out to, and dealt with, their patrons and patients; the method and system by which their books of account were uniformly kept; the unvarying manner in which the individual earnings of each member of the group were credited upon the books of account to the respective individuals of the group; the uniform practice of charging each individual of the group, share and share alike, with the general overhead expenses of the professional enterprise, and of charging each individual of the group with the dental supplies used, in the proportion or ratio that the annual net earnings of each individual bore to the annual net earnings of the entire group—all tend to warrant credence in, and to give support to, the personal testimony of plaintiffs, and to refute the claim and contention of the defendant D'Oench that there was no actual contract or agreement between the parties respecting the method and basis of distribution of the joint earnings of the group, and that defendant D'Oench, as the sole and absolute proprietor of the professional business and practice, had the right to withhold or to distribute, the joint earnings of the group, according to his arbitrary caprice and whim.

From the oral testimony of the parties, together with all the facts and circumstances in evidence, both the referee and the trial chancellor alike reached the conclusion of law that each member of the group was entitled to receive and enjoy, as his proportion of the net profits of the group, the net earnings or income derived from his or her individual services and practice. Such conclusion of law, we think, is properly and reasonably to be inferred and drawn from the indisputable fact that each member of the group was uniformly credited upon the books of account kept by the group with the earnings or income derived from his or her individual services, when such indisputable fact is viewed and considered in conjunction with the oral testimony of the parties and with the other facts and circumstances in evidence. We are therefore of the opinion that neither the referee nor the trial chancellor, by their findings and conclusions herein, attempted to make a contract for the parties by implication of law, as is contended by appellant, but that the existence and terms of the actual contract between the parties, as found by the referee and the trial chancellor, were properly and reasonably drawn and

inferred from all the facts and circumstances in evidence, in conjunction with the oral testimony adduced by the parties. We find no error in the decree and judgment of the court *nisi*.

**III.** **Error** is assigned in the action of the trial court in sustaining plaintiffs' motion to strike defendants' amended answer from the files. The amended answer was filed by defendants long after the trial of the action before the referee, and after the filing of the referee's report. The trial before the referee was had upon the original answer of defendants, which was a mere general denial of the averments of the petition. The amended answer pleaded the special equitable defenses of waiver, estoppel and laches on the part of plaintiffs. Such defenses are affirmative, and must be specially pleaded in the answer in order to be available to a defendant. [21 C. J. 1242; *idem*, 257; Coleman v. Insurance Co., 273 Mo. 620, 631; Turner v. Edmonston, 210 Mo. 411, 428.] They were not pleaded in the original answer upon which the action was tried before the referee, and were to some extent, at least, inconsistent with the single theory presented and contended for by defendants upon the trial before the referee, which theory was that defendant D'Oench was the sole and absolute proprietor of the professional business conducted by the group, and that the relation existing between defendant D'Oench and the other individuals of the group was merely that of employer and employees. The effect of the amended answer, if the same had been permitted by the trial court to stand and remain as a pleading in the cause, would have been to work a substantial change in the defense pleaded in the original answer, and to have compelled the plaintiffs to meet new and different issues which were raised and presented after trial of the action, and which necessarily would have required the production of different and additional evidence by the plaintiffs, in order to meet the new issues presented by the amended answer.

While liberality in allowing amendments to pleadings is accorded under our Code of Civil Procedure, in furtherance of justice, such amendments are properly allowable under our statute only "when the amendment does not change substantially the claim or defense." [Sec. 1274, R. S. 1919.] Such has been our uniform and consistent holding under the statute. [Joyce v. Growney, 154 Mo. 253, 263; Little River Drainage District v. Railroad Co., 236 Mo. 94, 113; State ex rel. v. Reynolds, 277 Mo. 14, 21.] Our own rulings upon the subject are in entire accord with the prevailing rule of practice in equity cases, which rule is thus clearly stated in 21 Corpus Juris, 537: "While a defendant is sometimes permitted by amended or supplemental answer to set up a defense not raised by the original, this will not be done where the defense existed and was known when

the original answer was filed, or where the defense is not consistent with the ends of justice, or where new issues operating as a surprise would thereby be raised, or unless there is some prospect that evidence to support the amendment can be obtained. As a general rule the court will not permit an amendment which will entirely change the nature and theory of the defense, especially after protracted litigation and at a late stage of the case.''

At most, it is largely discretionary with the trial court to permit amended pleadings to be filed out of time, and such discretion of the trial court will not be interfered with on appeal unless it obviously has been abused. [Carr v. Moss, 87 Mo. 447, 450; State ex rel. v. Reynolds, 277 Mo. 14, 21.] We find no abuse of discretion by the trial chancellor herein, especially in view of the fact that the amended answer worked a substantial change in the original defense and theory of defendant, and was filed long after the trial was had before the referee, and on the very eve of the hearing upon the exceptions to the referee's report.

It follows that the decree and judgment of the circuit court should be affirmed, and it is so ordered. *Ellison* and *Ferguson, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.