Della E. MURRAY, Plaintiff-Appellant,

v.

Carl E. MURRAY, Defendant-Respondent.

No. 45077.

Supreme Court of Missouri.

Division No. 1.

July 9, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 10, 1956.

N. Murry Edwards, Ninian M. Edwards, St. Louis, for appellant.

Lackland H. Bloom, John T. Murphy, Jr., St. Louis, for respondent.

HOLMAN, Commissioner.

Plaintiff and defendant were husband and wife from the time of their marriage in 1936 until June 17, 1954, when defendant husband was granted a divorce. In this action plaintiff attacks generally a property settlement made by these parties in contemplation of the divorce. The petition contains three counts. In the first, plaintiff seeks to set aside certain deeds whereby her interest in their home (held as tenants by the entireties) was conveyed to a straw party and after the divorce conveyed by said party to defendant. The second count seeks judgment for the value of her interest in certain jointly-owned California real estate which was deeded in like manner. The judgment sought in the third count was for one half of the value of certain jointly-owned household furnishings and for an additional sum of $600 alleged to have been the separate earnings of plaintiff which was collected and retained by defendant. The decree of the trial court adjudged that Count I be dismissed, and judgment was entered for defendant on Counts II and III. Plaintiff has duly appealed.

The evidence indicates that the Murrays had had some marital difficulties from the time defendant returned from the Army in 1946 until they separated May 17, 1954. In 1952 they sold their home and furniture and went to California. Four months later they came back to St. Louis. However, while in California they bought 2½ acres of land for $2,500. They made a down payment of $500 thereon with the balance to be paid at the rate of $30 per month. Upon

their return to Missouri these parties purchased a new home on Mackenzie Road in St. Louis County for $14,750. A deed of trust was given for a substantial part of the purchase price upon which was due, at trial time, $10,300. There was evidence to indicate that both parcels of real estate had increased in value since they were purchased. New furniture, costing about $3,000, was purchased and paid for out of their joint bank account. The Murrays had one child, Donald, who was born in 1939.

Several months before the separation plaintiff became romantically involved with a Mr. Femmer. He lived in St. Charles, Missouri, but had an office near the Murray home and was friendly with both the Murrays. Mr. Femmer was married and had three children. According to defendant, in early May, 1954, plaintiff (in the presence of Femmer) told him that she and Femmer were "madly in love." The next day defendant asked her not to break up their home but to have Femmer stay away and give them a chance to patch up their differences. It was agreed that such an effort would be made but within three or four days these efforts were apparently abandoned by plaintiff and Femmer. A conference was held at the Murray home about May 15, at which time Mrs. Murray and Femmer told defendant, in effect, that they wanted to get married, and defendant told them, "Then I am tired of fighting this thing. I just give up." At that time defendant says plaintiff told him "that if I would just give her a divorce, that I could have all the property and things we had, because I had worked awful hard for them." The next morning Mrs. Murray asked defendant to go with her to see a lawyer. He refused, telling her that if she wanted a divorce she would have to get it (and pay for it) herself.

On May 17 plaintiff left the home. She says that defendant ordered her to leave and threatened to kill her. He denied this. Two or three days later she flew to California to visit a friend. On May 25, Mr. Murray consulted Mr. George Dyer, an attorney, about a divorce. Dyer gave him a paper with his name, address and telephone number written thereon. Murray then took this paper to Mr. Femmer and suggested that he contact Mrs. Murray and have her see Mr. Dyer. Femmer called plaintiff in California and she immediately took a plane back to St. Louis. Upon arrival she called Mr. Dyer and he requested that she come to his office on May 27. On that date she went to the office and conferred with Mr. Dyer and her husband. Mr. Dyer refused to proceed with the matter until he conferred privately with Mrs. Murray in an effort to bring about a reconciliation. When this effort failed they proceeded to discuss a divorce.

It appeared from the outset that plaintiff was willing to transfer substantially all of their property to defendant. The only point in controversy seemed to be the $600 plaintiff said defendant owed her. When she asked defendant to pay that amount he refused. At this point Dyer explained to Mrs. Murray that he was not her attorney but was representing her husband; that he thought she and Murray had agreed upon a settlement; that since she was not represented by an attorney he would not try to effect any settlement and that he would not proceed further unless the parties could agree between themselves as to the terms of a property settlement. Either at that time or shortly thereafter these parties came to an agreement and Mr. Dyer proceeded to prepare the instruments that were signed when they returned to the office on June 2. Mr. Dyer testified that on that date he read all of the instruments and papers to the Murrays and then his secretary, Miss Britton, took the parties into another room where they signed them. The acknowledgments were taken by Martha Burwell, another secretary in that office.

The instruments and agreements signed, at that time were (1) the settlement agreement whereby, for a recited consideration,

of $25 paid to Mrs. Murray, it was agreed, in effect, that Mr. Murray would receive all of plaintiff's interest in the real and personal property belonging to this couple except that plaintiff was to get a Singer electric sewing machine and all of her clothing and personal effects. It was further provided that if Mr. Murray was not granted a divorce within 40 days Miss Britton, the straw party in the deeds, was to reconvey the real estate to said parties, (2) a deed from the Murrays to Miss Britton conveying the St. Louis home, (3) a like deed conveying the California property, (4) a bill of sale whereby plaintiff conveyed to defendant her interest in the personal property in their home, except the sewing machine and personal effects heretofore referred to, (5) an affidavit which Mrs. Murray signed to the effect that she had lost a power of attorney given her by Mr. Murray while he was in the Army and agreeing that, if found, she would never attempt to use it, (6) An Entry of Appearance and an Answer to be filed in the divorce suit were signed by Mrs. Murray, and (7) a stipulation in the divorce suit which provided (a) that if a divorce was granted, custody of the child be given to Mr. Murray with the right of reasonable visitation in Mrs. Murray, (b) that Mrs. Murray not be awarded any sum for legal services that may have been rendered to her in that cause, (c) that Mr. Murray pay the costs of the case, and (d) that the cause be heard at the earliest possible date convenient to the court.

The deeds to Miss Britton were recorded promptly. A divorce was granted to Mr. Murray on June 17, 1954. Miss Britton executed deeds on June 18 conveying the real estate to Mr. Murray and these were promptly recorded. About the middle of August, 1954, Mrs. Murray went to the home with her son to get some of her personal effects. On this occasion defendant came in and, during an argument which ensued, struck plaintiff. Shortly thereafter the instant action was filed.

It appears from the transcript that Mr. Femmer and Mrs. Murray had continued their interest in each other until the time of trial. However, they had not married. An event that had occurred in the Femmer family had made it prudent for Mr. Femmer to delay any effort to procure a divorce from his wife. Defendant, however, had married again in the early fall of 1954. Other evidence, as well as certain specific findings of the trial chancellor, will be disclosed and discussed in the course of the opinion.

■ This action is in equity and we review the cause de novo. On issues involving the weight and credibility of oral testimony we give due deference to the findings of the trial court. Gardine v. Cottey, 360 Mo. 681, 230 S.W.2d 731, 18 A.L.R.2d 1100. At this point we may say that we are not only willing to defer to the findings of the chancellor herein, but our review of the evidence has caused us to independently make substantially the same findings.

■ At the outset plaintiff contends that she signed the aforesaid documents under duress because she feared defendant would kill her; that she did not understand that she was conveying away her interest in the property; that she thought she was only signing papers for a divorce and that she did not intend to convey her property. On this issue the trial court made findings as follows: "(1) The plaintiff understood what she was doing when on June 2, 1954, she executed the Stipulation, Warranty Deed, Quitclaim Deed and Bill of Sale, introduced in evidence, and she intended by executing said instruments to accomplish the legal effects that normally result from executing such instruments. (2) The plaintiff did not on June 2, 1954, execute the instruments because of fear of the defendant nor under duress by the defendant." We agree with these findings. Mr. Dyer and others in his office testified

that plaintiff discussed the matters freely and had no appearance of being afraid. Moreover, after the papers were signed, plaintiff and defendant went to a nearby restaurant together and visited while having a cup of coffee. Also, the fact that plaintiff, before the separation, was willing to frankly discuss with defendant her affection for Femmer does not tend to substantiate a finding that she feared him. Nothing in the testimony tends to corroborate plaintiff's testimony that she acted under duress.

■ Furthermore, we think plaintiff fully understood, before going to the Dyer office, that she was to give up substantially all of her interest in their property in return for her freedom. In addition to the evidence already related it should be noted that on the night before plaintiff left the home she told a neighboring couple about her intention to leave defendant, and in reply to a question about their property plaintiff stated "that she didn't expect to get anything, that all she wanted was Orlie [Femmer], that they were very much in love." We also have the view that Mr. Dyer fully explained the content and effect of the instruments to Mrs. Murray and that she understood his explanation.

The decree contained findings as follows: "(6) The stipulation and the agreement of June 2, 1954, were contrary to public policy and illegal, for the reason that they were executed by the parties as a result of (a) plaintiff's desire for a divorce so that she might be free to marry Femmer; (b) defendant's verbal agreement that he would prosecute a divorce action against plaintiff on condition that she would relinquish to him all her interest in their jointly-owned property, excepting only some personal property of relatively little value; and (c) plaintiff's voluntary acceptance of defendant's said conditions in order to secure her freedom. (7) Said illegal agreement of June 2, 1954, having been fully executed by the parties prior to the commencement of this action, the general rule applies that neither party to an (illegal) agreement that has been executed on both sides will be aided in recovering what has been parted with under the agreement. (8) In entering into said illegal agreement of June 2, 1954, the parties were in pari delicto since (a) plaintiff was the promoter of the divorce; (b) plaintiff was fully informed as to what property defendant had; (c) defendant made no misrepresentations to plaintiff; and (d) plaintiff had determined even before defendant consulted counsel that she would relinquish all her interest in the jointly-owned property in order to be free of her marriage to defendant."

While the stipulation and agreement of June 2, 1954, did not contain an express provision that the husband would obtain a divorce and that the wife would not contest the action, there can be no doubt that such was their actual understanding. The real consideration for the transfer of the wife's interest in the property was the agreement of the husband to procure a divorce so that Mrs. Murray would be free from the marriage bonds. Note the following testimony of Mrs. Murray:

"A. It was agreed we both wanted a divorce.

"Q. When you say you both wanted a divorce, you refer, of course, I suppose, to Mr. Murray and yourself? A. Yes, sir. * * *

"Q. Why did you sign all those papers there in Mr. Dyer's office? A. Because I wanted a divorce.

"Q. Was that your reason? A. That was my reason."

Likewise, Mr. Murray testified as follows:

"Q. Was there any agreement about who was to get the divorce there in the office? * * * A. Mr. Dyer explained to her that I had employed him as my attorney to get a divorce for me.

"Q. Was the agreement on that second visit, when Mrs. Murray was there, as to who was to get the divorce, as to whether you would get it or she would get it? A. Yes, sir.

"Q. And what was the agreement? A. That I would get the divorce.

"Q. It was clearly the agreement? A. Yes, sir.

"Q. No question about that? A. No, sir.

"Q. Was it the agreement that she was not to get the divorce? A. Yes, sir. * * *

"Q. Did you read over the petition for divorce before you signed it? A. Yes, sir.

"Q. Did you in that petition charge Mrs. Murray with association with Mr. Femmer or any other man? A. No, sir.

"Q. Why didn't you do that? A. Because of the reputation and stigma it would leave on my son.

"Q. Was that the agreement, when you agreed that you should get the divorce, that you wouldn't do that? A. Yes, sir.

"Q. And who did you make that agreement with? A. With Della.

"Q. With Mrs. Murray? A. Yes, sir.

"Q. When you and she agreed that you could get the divorce? A. Yes, sir."

We have concluded from a consideration of the entire record in this case that these parties agreed that the husband would proceed forthwith in an effort to procure a divorce and that the wife would make no defense thereto. Everything done by the parties and the reasonable inferences to be drawn therefrom points to the conclusion that the agreements of these parties were primarily designed to promote a divorce. There was evidence from which it could have been found that neither the husband nor his wife could qualify as an innocent party. Hence, in the event of a contest, it is entirely possible that neither would have obtained a divorce.

■■ "It is well settled that a husband and wife, in contemplation of separation and divorce, may contract between themselves to settle and adjust all property rights arising out of the marital relation. North v. North, 339 Mo. 1226, 100 S.W.2d 582, 109 A.L.R. 1061; Bishop v. Bishop, Mo.App., 162 S.W.2d 332; Ellis v. Ellis, Mo.Sup., 263 S.W.2d 849. However, it is elementary that if the agreement provides that a party will not defend a divorce suit or if it may be construed as an agreement designed to bring about and promote a divorce, the public policy of this state requires that it be adjudged void. Bloss v. Bloss, Mo.Sup., 251 S.W.2d 78." Farrow v. Farrow, Mo.Sup., 277 S.W.2d 532, 535. The illegal nature of the agreement need not appear in the written contract. "The rule which forbids the introduction of parol evidence to contradict, add to, or vary, a written instrument does not extend to evidence offered to show that a contract was made in furtherance of objects forbidden by statute, by the common law, or by the general policy of the law. Evidence of an illegal agreement with which the contract in suit is directly connected is competent evidence." 17 C.J.S., Contracts, § 596, p. 1242.

■ It follows from the foregoing that the instant agreement was contrary to the public policy of this state and hence was void. It also is apparent that the contract was fully executed on both sides. In this situation it is a well-established general rule that neither party will be aided in recovering that which has been parted with under the agreement. The courts will leave such parties where they have placed themselves. Jones v. Jones, 325 Mo. 1037, 30 S.W.2d 49; Blank v. Nohl, 112 Mo. 159, 20 S.W.

477, 18 L.R.A. 350; Idel v. Hamilton-Brown Shoe Co., 343 Mo. 373, 121 S.W.2d 817; Vock v. Vock, 365 Ill. 432, 6 N.E.2d 843, 109 A.L.R. 1170; 17 Am.Jur., Divorce and Separation, Sec. 739, p. 555. However, the courts will generally refuse to apply this rule if it appears that the party seeking relief was not in pari delicto with the other party.

▋ Plaintiff contends that she should not be denied relief under the foregoing rule as she is a person of limited education (eighth grade), was not represented by counsel, received very little under the agreement and was not in pari delicto with the defendant. She relies mainly upon Gardine v. Cottey, supra. We think the situation before us is much different than that in the Gardine case. There the husband and his attorney were the moving parties in seeking the agreement. After reviewing the evidence the court therein concluded that Mrs. Gardine was induced to enter into the property settlement contract by fraud, duress, and concealment. We have already indicated our view that no such situation existed in the instant case. Plaintiff did not enter into the agreement as a result of any fear, duress, or fraud practiced upon her. Mr. Dyer did not negotiate the settlement; he made it clear that he was the attorney for defendant and would not endeavor to obtain her consent to a property settlement as she was not represented by counsel; no facts appear to have been withheld or misrepresented. A review of the evidence in this case causes us to conclude that plaintiff was active in seeking the agreement which would cause defendant to obtain a divorce and that she freely entered into the contract and executed the various documents with full knowledge of the contents and legal effect thereof. We therefore hold that she was in pari delicto with defendant and hence is not entitled to any relief in the recovery of her interest in the property conveyed by the deeds and bill of sale.

Plaintiff has briefed contentions that the instruments in question were invalid because (1) there was no consideration therefor, (2) the settlement was not fair, just or equitable, and (3) there was no valid delivery of the deeds. In view of the foregoing ruling it would serve no purpose to consider these contentions.

It would seem that our said ruling may not be applicable to preclude plaintiff from seeking recovery of the $600 claimed in Count III and we will therefore review that claim on the merits. The facts out of which said claim arose have not yet been stated. The Murrays lived in an area where many new homes were being constructed. Mrs. Murray was employed by Mr. Krumm, a builder, to clean these houses after they were completed and thus get them ready for delivery to the owner. This involved washing windows, cleaning floors, etc. In this maner she earned the $600. Payment was made by two $300 checks. One was made payable and delivered to Mr. Murray at the direction of Mrs. Murray. The other was made payable to Mrs. Murray but she endorsed it and delivered it back to Mr. Krumm to apply on her husband's account for materials purchased.

Plaintiff contends she is entitled to recover this sum in this action for money had and received and that in equity and good conscience defendant ought to pay the money over to her. The finding of the trial court as to this claim was as follows: "Regarding plaintiff's earnings in the sum of $600.00, alleged by plaintiff to have been collected by defendant in 1953, the evidence does not establish that a creditor-debtor relationship arose between plaintiff and defendant as a result of this transaction."

▋ The cases cited by plaintiff clearly establish the rule that the action for money had and received will lie where a defendant has received money belonging to another which, in equity and good conscience, he should pay to the owner. Web-

ster v. Sterling Finance Co., 351 Mo. 754, 173 S.W.2d 928. However, it is our view that plaintiff may not recover on the theory of money had and received under the instant facts. This, for the reason that the evidence here shows that plaintiff agreed that the money be paid to defendant or on his account, and there is no contention that defendant agreed to pay it back to her.

 It appears to be well settled that if a man uses the money of his wife, with her consent or acquiescence, she cannot recover the same unless at the time of using the money he promised to repay it. Crowley v. Crowley, 167 Mo.App. 414, 151 S.W. 512; Brell v. Brell, 143 Md. 443, 122 A. 635; 41 C.J.S., Husband and Wife, §

301(b), p. 786. It would seem that this money was a contribution by plaintiff to the joint financial welfare of this couple. It follows from what we have said that plaintiff is not entitled to recover on this claim.

The judgment and decree of the trial court is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.