Bob SITZES, Plaintiff-Respondent,

v.

Carl B. RAIDT, Defendant-Appellant.

No. 7805.

Springfield Court of Appeals.

Missouri.

May 13, 1960.

Dwight Crader, Sikeston, for appellant.

G. W. Gilmore, Sikeston, Thomas L. Arnold, Benton, for respondent.

McDOWELL, Judge. .

This appeal is from a judgment in favor of plaintiff, Bob Sitzes, and against defendant, Carl B. Raidt, in an action for accounting for rents and profits and for cancellation of farm lease.

The petition, filed in the Circuit Court of Scott County, Missouri, February 7, 1958, alleged inter alia, that plaintiff and the defendant entered into a five-year, written lease dated March 24, 1953, whereby plaintiff leased to defendant his 306-acre farm reserving as rents a certain share of the crops and profits on livestock produced during the lease term. (The lease is attached to the petition and made a part thereof.)

It states that subsequent to the execution of the lease the parties agreed to produce livestock (cattle and hogs) and the defendant has failed and refused to account to plaintiff for the profits due under the lease. It alleged that plaintiff made demand upon defendant for accounting for crop rents and profits on livestock and that defendant has refused to account for such rents and profits and has concealed from plaintiff information concerning such profits and crop rents and is indebted to plaintiff for such profits on livestock and crops so produced, including seed and other property, and pleads that by reason of the wrongful conduct of the defendant in the non-payment of rents as agreed, the lease has been breached and forfeited and that plaintiff is entitled to the return of said land.

Defendant filed answer and counterclaim. The answer admits the execution of the written lease and denies all of the allegations of the petition. The counterclaim pleads that on June 28, 1958, the barn on the farm was totally destroyed by fire; that demand had been made on plaintiff to rebuild the same and such demand refused;

that by reason of such wrongful refusal to rebuild said barn, defendant has been damaged and in the future will be damaged $1,000 per year.

There is no reply to the counterclaim.

The cause was referred to a referee who heard the evidence and filed his report stating findings of fact and conclusions of law February 10, 1959. Written exceptions to this report were filed by defendant, which exceptions were heard by the trial court and overruled March 12, 1959, and judgment entered affirming the findings of the referee.

The judgment was in favor of plaintiff on the petition for $1,978.19 less credits found in favor of the defendant for $606.80, leaving defendant indebted to plaintiff in the sum of $1,371.39, and it was further the judgment of the court that defendant had violated the conditions and spirit of the lease and had fraudulently withheld portions of the money derived from crops and livestock and wrongfully refused to account for same and that some crops were converted by defendant and no true account rendered for same and that said violations of the contract continued during the life of said lease and that by reason of such conduct the lease is declared void. The court made certain divisions of crops raised in 1958 which we will not set out because such findings are not in dispute.

Seven allegations of error are assigned by defendant-appellant as grounds for reversal of the findings of the trial court.

Alleged error numbered II complains of the court's finding for plaintiff in the sum of $260.47 for profits on cattle and hogs instead of $161.73 because the court twice allowed respondent profits on cattle sold in 1958.

Error numbered III complains of the court's finding of $1 damages for rent on farm house because of lack of evidence.

Error numbered IV complains of the finding of $120 pasture rent and alleges that the finding should have been for $30, being rent for 1958.

Error numbered V complains of the court's action in allowing $542.84 for 1958 corn crop, alleging that respondent received all of the rent due for such corn.

Error numbered VI complains of the action of the trial court in cancelling the lease because appellant had fraudulently withheld from respondent portions of money, crops and livestock; (b) because he wrongfully refused to account for the same; (c) because he converted crops, and, (d) because he failed to make a true account.

Error numbered VII complains of the finding of the trial court cancelling the lease and ordering possession delivered to respondent because the court had no authority under the evidence to make such finding where there was no forfeiture clause in the lease.

Error numbered VIII complains of the action of the trial court in assessing all the costs against appellant contending that such costs should be equally assessed to each of the parties.

The record in the cause contains more than 800 pages of evidence, including the findings of fact and conclusions of law of the referee. Much of this evidence has no relation to the issues in the cause and will be by us disregarded. We here state briefly such facts as we believe bear upon the issues to be decided.

On March 24, 1953, plaintiff leased to the defendant his 306-acre farm in Scott County, Missouri, for a period of five years, possession to be delivered on the date of the lease and the lease to terminate December 31, 1957. It contained an extension clause for an additional term of five years at the option of the second party or until De-

cember 31, 1962, upon the same terms and conditions; provided that second party notify the lessor of his intention to exercise the option on or before November 1, 1957. We hereby set out the provisions of the lease we think pertinent to the issues:

"4. Such crops shall be planted by second party as he desires, except that, weather permitting, he will plant the full amount of cotton which may be allotted by the government.

"5. As rent second party agrees to deliver to gin one-fourth of all cotton raised and deliver to elevator or nearest market one-third of all corn, beans, wheat, hay, lespedeza or other crops; second party shall pay cash rent of $10 per acre for pasture, which shall not exceed five acres; should the parties hereto decide to produce livestock, cattle or hogs, then first party shall receive one-third of the gain or pay one-third of the loss, and furnish one-third of the feed, cost of livestock and veterinary service.

"6. In order to produce livestock, it may be necessary to allocate a certain portion of the farm to permanent pasture, and first party agrees to furnish one-third of the seed and fertilizer therefor; and it is agreed that the first party shall furnish one-fourth commercial fertilizer required for cotton and one-third for other crops.

"9. First party agrees to replace any buildings which may be destroyed by storm or fire during the term of this lease.

"11. It is further understood that second party will not assign this lease or sublet any part of the property without the consent of first party."

In conformity to the terms of the lease, the parties agreed in 1954 to go into the cattle business. Plaintiff failed to pay his part of the purchase price but agreed with defendant that he would pay defendant interest on his one-third of the purchase price (defendant to pay the entire amount). The trial court found there was no agreement to go into the hog business.

The evidence showed that after the filing of the suit defendant tendered to plaintiff certain amounts of rents and profits admittedly due him under the lease and at the same time made a written demand for certain amounts defendant claimed plaintiff owed him. At the beginning of the trial defendant made a written tender, which is in evidence as Document No. 13, set out on page 70 of the original abstract. This tender is in words and figures as follows:

"Settlements Due Plaintiffs

"1. Seed Beans (Sold by Deft. & used by Deft.) 199.37
2. 1957 Cattle, since 4–19–57 86.00
3. 1958 Wheat, sold to Embro Seed House 664.50
4. 1958 Corn, Sold to S. C. M. C. 963.50
5. 1958 Beans, sold to S. C. M. C. 1,986.35 Paid
6. 1958 Milo Marge:
 (a) 22,980 lbs. to Mikeo Grain Co., Cairo (unsettled for) $1.75 cwt. to be applied on rent.
 (b) Stored on Raidt farm, 55,150 lbs. (weighed at Semo Gin Co.) Deft. will pay Deft. in money on Milo he has.
7. 6 bales of 1958 cotton at Semo Gin Co., unsettled for. Bal. of 1958 crop paid to Plaintiff and Defendant by separate checks.
8. Approximately 7800 lbs. lespedeza seed unsettled for at Embro Seed House.
9. 1958 cash pasture rent $30.00."

We will not set out claims made by the defendant for sums due him from plaintiff, under the contract, for the reason that the court found that plaintiff owed the defendant $606.80 and neither side has made any exceptions to such finding.

In the court's judgment he itemized the findings for plaintiff which made a total judgment of $1,978.19. These items are as follows:

"1. For failure to properly account to plaintiff on the cattle and hog account ---------------------- $260.47
2. For failure to properly account to plaintiff on the 1957 Milo maize crop ---------------------- 100.00
3. For failure to properly account to plaintiff for the 1958 corn crop -------------------------- 542.85
4. For failure to properly account to plaintiff for the 1956 seed beans ------------------------- 199.37
5. For failure to properly account to plaintiff for pasture rent ------------------------------ 120.00
6. For damages and failure to account for improper rental of farm house (Nominal damages) ----------------- 1.00
7. For failure to properly account to plaintiff for 1958 wheat crop --------------------------- 664.50
8. For failure to properly account to plaintiff for anhydrous ammonia for 1956, by way of overcharge--------- 90.00

$1,978.19"

Likewise, the court, in its judgment, sets out the items found that constitute the credits due defendant in the amount of $606.80, which are as follows:

"1. On account claimed by defendant against plaintiff in the stated amount of $581.80 -------------------------- $581.80

2. On account claimed by defendant for cotton seed and other items --------------------------------------- 25.00

$606.80."

The evidence offered to sustain item No. 1, to wit: $260.47, profits due plaintiff on cattle, is as follows:

The referee, in his report to the court, as shown in the record at pages 25 and 26, sets out the items that combine to make his finding of $260.47, as follows:

"Defdt. owes Plaintiff a/c (Defendant's testimony)
1957 error $75.93

Defdt. owes Plaintiff a/c 1957 (Doc. #13, P. 82 of deposition 86.00
" " " a/c 1958 cattle (Defendant's Testimony) 98.74."

---

The item of $86 is admitted by defendant and was tendered to plaintiff in document 13 of the record. Item of $98.74 for 1958 cattle is denied by the defendant and we find from the record that this item is a duplication of the figure of $86 allowed

above. The only testimony on these items is that of the defendant. In his deposition he gave this testimony:

"Q. On the reverse side of this sheet, it's also marked 12–27–57, accounts since April 19, 1957, Accounts I owe Bob, you've got cattle, then you say sold $1729.44 and cost $1406.21. You get a difference of $323.23 and you have hauling $27.00, feed $4.50, interest $32.72, a total of $65.22, which you subtract from $323.23 and arrive at a sum of $258.01. A. That's right.

"Q. You divide that by three and get $86.00? A. * * * That's right."

We will not quote all of the evidence but defendant states the number of head bought, the date they were bought, 7–20–57, and the date they were sold, 10–3–57, and from whom the cattle were purchased and to whom they were sold. The item of $98.74, allowed by the court was arrived at from this same sale of cattle by subtracting the cost of hauling, to wit $27. If the entire $65.22, being total cost of the transaction, had been, by the court, subtracted, he would have found it would have left $86. It is unnecessary to set out all of the evidence touching this matter but it is clear to this court that the item of $98.74 should not have been allowed, it being the same item as $86, which was properly allowed. The judgment for this item should have been for $161.73 instead of $260.47. This court further finds from the evidence that there was no concealment by the tenant or any attempt to convert to his own use profits due plaintiff for the record shows that this was actually a settlement in 1958 after the filing of the lawsuit. The first item of $75.73 was an error in adding the profits and the costs. There isn't the slightest evidence in the record that there was ever any wrongful conduct on the part of defendant so far as the cattle business between the parties was concerned.

In item No. 2, failure to account to plaintiff on the 1957 Milo maize crop of $100, we agree with the referee and the findings of the trial court that there was due plaintiff $100. The evidence is that in the year 1957 there was a great amount of rain and Milo, being a long maturing crop, could not be harvested as usual and defendant testified that in order to save the crop in January, 1958, he and the plaintiff agreed that if defendant would employ outside help, to wit, two combines to harvest the crop, plaintiff would pay one-third of the cost of the outside help. Defendant employed two outside combines at $150 each, a total cost of $300, and charged as expense, against plaintiff's share, $100, being one-third of employed labor. Plaintiff denied this agreement and the court found for plaintiff in the sum of $100.

The third item, to wit, failure to account for the 1958 corn is an issue in this case. The evidence was that plaintiff's share of the 1958 corn crop, to wit, 1,192.85 bushels was delivered to the Scott County Milling Company in compliance with the lease. The Scott County Milling Company had no storage space by which this corn could be put in the government loan and would only accept it for sale and defendant sold the corn, which brought $963.50. A check was drawn by the Scott County Milling Company in favor of plaintiff for that amount and mailed to him but he refused, and still refuses, to accept it. The plaintiff contends that the loan price was $1.41 per bushel and that the Scott County Milling Company only paid .97 cents per bushel; that defendant had no right to sell the corn, and, therefore, is indebted to plaintiff in the sum of $542.85, for which amount the court rendered judgment for plaintiff. There is no contention that defendant did not deliver the full amount of the rent corn for 1958. The only contention was that he wrongfully sold the corn.

Item numbered 4 is for failure to properly account for 1956 seed beans in the amount of $199.37. The evidence supporting this finding is as shown in defendant's account sheet, (exhibit 32). This exhibit shows that 59 bags of 1½ bushels each were sold to

A. L. Smith for $3.25
per bushel or........... $288.63;
that defendant kept 69 bags for seed in 1957 at
$3.00 per bushel, or ....... 309.50

$598.13 total;
that one-third of this amount or $199.37 was due plaintiff.

The defendant testified that the above beans accounted for were the remains of the 1956 crop that were stored on the farm; that plaintiff sold the beans to A. L. Smith but that Smith paid for the same in July, 1957, to him (defendant). Defendant gave this testimony:

"Q. Would you tell us why Bob's money is still in your possession? A. Well, Bob owes me some money.

"Q. Tell us whether or not there has ever been a settlement between you and Bob since this money came into your possession? A. No, sir. He has been rather hard to settle with. He has been preparing a law suit for over a year."

Item 5 is for failure to account for pasture rent of $120. The evidence supporting this item of the judgment is that under the terms of the lease defendant fenced off three acres of land in the latter part of 1953 and sowed it in permanent pasture for which he was to pay cash rent of $10 per acre. Plaintiff admits that the first year, 1954, the rent was paid but states that was all he ever collected. The defendant testifies that for the year 1955 he paid plaintiff three $10 bills, cash, and that for the year 1956 he gave plaintiff his check for the rent, which plaintiff accepted in defendant's home, and has never cashed. The rent for the year 1957 had not terminated when the suit was filed. Plaintiff denied ever receiving any cash payments of rent. Under this testimony the court found for plaintiff for the years 1955, 56, 57 and 58, or $120.

Item numbered 6 is for $1 rent allowed for improper rental of a farm house. The only evidence supporting this finding was given by plaintiff, as set out on transcript, page 40, which is as follows:

"Q. Mr. Sitzes, do you know whether or not there has been any subletting of any part of that farm since Mr. Raidt has been on it? A. Well, there has been a house rented down there I understand.

"Q. Do you know to whom it has been rented? A. To a boy named LaRue.

"Q. Do you know how long it has been rented to him? A. No, sir, I don't. It was this summer or spring some time.

"Q. Have you ever had an accounting of any of the rents from that renting? A. No, sir."

Item numbered 7 is for failure to properly account for 1958 wheat crop in the amount of $664.50. The defendant testified that the 1958 wheat crop was delivered and sold to Embro Seed House for $1.65 per bushel (as shown by defendant's exhibits 128 to 134 and 135). He testified that the crop was sold for $1,989.91 and that plaintiff's part was $660.66. In his offer of settlement, document 13, offered in evidence, he admits he owes plaintiff $664.50 for such wheat. Defendant's exhibit 135 shows that the number of pounds of wheat sold was 71,820 or 1,197 bushels; that the market price was $1.65, which amounts to $1,975.05. Plaintiff's one-third thereof would be $658.-35. Defendant's exhibits 128 to 134 are carbon copies of the weight tickets issued by Ed. F. Mangelsdorf & Bros. Inc., of St. Louis, Missouri; exhibit 128 being dated June 23, 1958, and the others dated June 24, 1958, all issued to the defendant.

The evidence shows that the Embro Seed House was operated by defendant's brother-in-law; that defendant purchased the wheat himself, had it certified for seed and sold it to the Embro Seed House for $2 per bushel. Defendant testified that he has always been willing to pay plaintiff his one-third of the income from the wheat. He testified that he approached plaintiff about

having the wheat certified for seed and plaintiff refused to pay his part of the cost; that defendant had to pay all of the certification costs, which expenses were as follows: cost of cleaning .20 cents per bushel, $239.40; cost of bags $117; inspection, certification and tags $78.11, total $434.51. Witness testified there were 1,197 bushels of the crop which sold for $2 per bushel, making a net of $1,989.91 and that plaintiff's part was $660.66, assuming that plaintiff would take his part of the wheat certified for seed, which he refused to do.

The evidence showed that Scott County Milling Company offered to buy the wheat at $1.50 per bushel for commercial purposes and that defendant had offered to pay plaintiff $1.65 per bushel for his part. Defendant testified plaintiff would have gotten $6 more if he had paid his part of the certification expense.

The court stated that defendant had offered in his settlement $664.50 for the wheat, which was a somewhat higher figure than is obtained from the testimony.

No testimony was offered by plaintiff from seed dealers as to the value of this wheat and the court recommended that plaintiff have judgment in the sum of $664.-50.

Item numbered 8 was allowed by the court for failure to account for anhydrous ammonia for 1956 by way of overcharge in the sum of $90. The evidence is that defendant employed others to put down the anhydrous ammonia. It is common knowledge that this fertilizer must be put down by a special machine and sealed in the ground. Under the contract the court found that all labor must be furnished by the defendant and that just the fluid used should be charged against plaintiff.

It is unnecessary to set out the testimony concerning the division of the other crops raised in 1958 for the reason that such crops were undivided at the time of the trial and were not even planted at the date of the filing of the lawsuit. The court made

an equitable division of such crops between the parties and the same is true of the one steer left on the farm from the cattle transactions.

We possibly will refer to some other facts from the record in our opinion. We will refer to the parties in this opinion as plaintiff and defendant, the position they occupied in the lower court.

■ Under § 510.310, subd. 4 RSMo 1949, V.A.M.S., it is provided that the appellate court "shall review the case upon both the law and the evidence as in suits of an equitable nature." It, therefore, becomes the duty of this court to review the evidence, determine its value and weight, and with due deference to the finding of the trial court reach our own decision on the merits. Ellis v. Farmer, Mo. Sup., 287 S.W.2d 840, 843(1); Hudspeth v. Zorn, Mo.Sup., 292 S.W.2d 271, 272 [1, 2]; Murray v. Murray, Mo.Sup., 293 S.W.2d 436, 439 [1, 2]; Mitchell v. McClelland, Mo.App., 306 S.W.2d 75, 79 [4].

■ It is first contended by defendant that the trial court erred in finding for plaintiff in the sum of $260.47 for cattle and hogs instead of $161.73 because the court twice allowed plaintiff profit on cattle sold in 1958.

With this contention we agree. The referee found that defendant was indebted to plaintiff in the sum of $75.73 because of an error in a settlement made in 1957 and that defendant was indebted to plaintiff for $86, as shown by document 13, page 82 of the transcript, and that defendant owes plaintiff $98.74, as shown by cattle settlement in 1958. These three items constituted the sum of $260.47. An examination of the evidence, (as shown by document 13, offered), shows that the item of $86 was profit made on the purchase of cattle from the Charleston Auction Company which cost $1,400.21 and sold for $1,729.44, leaving a profit of $323.23; that the cost of hauling was $27, feed $4.50, interest $32.72, making a total cost of $65.23,

which subtracted from $323.23, leaves a profit of $258.01, one-third of which makes $86 due plaintiff. The evidence shows that these cattle were purchased 7–20–57, 23 head, and were sold 10–3–57, one extra calf which was owned by the parties was added in the sale. The item of $98.74 was arrived at from the same sale of cattle but deducting only $27, cost of hauling, instead of deducting the entire cost (set out above) which amounted to $65.23, leaving due plaintiff $98.74. This is a duplication and should not have been allowed. We find for defendant on this alleged error and order that the judgment be modified to show indebtedness to plaintiff of $161.73 instead of $260.47.

■ Under alleged error numbered III defendant claimed that the $1 damages allowed plaintiff for failure to account for rental of house on farm is not supported by the evidence.

With this contention we agree. The only evidence offered as to the subletting of a house on the premises was that of the plaintiff. We have set out his testimony in our statement of facts. When plaintiff was asked if he knew if the house had been rented, he gave this answer: "Well, there has been a house rented down there I understand." When asked to whom it had been rented, he said, "To a boy named LaRue." He did not give the source of his information as to such rental and he had no knowledge of any of the terms of the rental. We think this evidence is wholly insufficient to support any judgment for rentals of property on the farm.

■ Under error numbered IV, defendant complains of the judgment of $120 for pasture rent claiming that all pasture rent had been paid except $30 for the year 1958.

The testimony as to this issue on the part of plaintiff was that he received $30 in the first part of 1955 for 1954 rental. He stated there was no rent for 1953 because the land was in crops. Plaintiff then denied he received any payment for pasture rent for 1955–56–57 and 1958. Of course at the time of the filing of the lawsuit in December, 1957, there would have been no rent for 1958. However, there is no contention that the 1958 rent had been paid at the time of the trial. Defendant testified that in the year 1956 he paid to plaintiff three ten dollar bills in payment for the 1955 rent; that at the first of 1957, in a settlement with plaintiff, he gave him a check for $30 which has never been cashed. Under the conflicting evidence we think that the trial court should be affirmed on this alleged error and judgment should be for plaintiff.

■ Under alleged error V, defendant complains of the allowance of $542.84 damages in favor of plaintiff on the 1958 corn crop claiming that defendant complied with the lease agreement and delivered the full amount of the corn to plaintiff.

It is plaintiff's contention that the lease contract gave defendant no right to sell the rent corn and that he violated the lease agreement to plaintiff's damage in the sum of 50 or 60 cents per bushel. The referee and the trial court found the damages to be $542.84, being the difference between the sale price that the corn brought at the market and what the corn would have brought if placed in the Commodity Credit Corporation.

The lease contract provides that defendant shall "deliver to elevator or nearest market one-third of all corn".

There is no dispute but that defendant did deliver to the Scott County Milling Company, one-third of all corn raised in 1958 as rent; that this corn was sold at the fair market price. The sole contention of plaintiff is that the provision "delivering to elevator or nearest market" does not include the right to sell.

In determining the rights of the parties under the lease, we must determine what the meaning of the word *market,* as used in the lease contract, is.

We are cited to no Missouri authority defining the word *market* as used in lease contracts and we find none. "Market" is defined in Ballentine's Law Dictionary as follows: "At common law, a franchise, conferring a right to hold a concourse of buyers and sellers. The word is derived from the Latin word 'mercatus,' which signifies trade or traffic, or buying and selling. See Matter of City of New York, 127 N.W. Misc.Rep. 710, 723, 217 N.W.Supp. 544 [127 Misc. 710, 723, 217 N.Y.S. 544]."

In 55 C.J.S. Market pp. 784, 785, the law is stated: "The word 'market,' in some connections, may be a technical term, but it also may be used without any technical meaning since it is not a term of fixed legal significance. In ordinary language it is a common word of the most general import having many meanings, and varying in its significance with the particular objects to which the language is directed and covering a variety of possible forms. It is derived from the Latin 'mercatus,' which signifies trade or traffic, or buying and selling. Thus the term 'market' conveys the idea of selling, and it assumes the existence of trade and implies competition, and also implies the existence of supply and demand, for, without the existence of either factor, no market is shown. A market is not a mere name without substance, and ordinarily a casual sale does not establish or create a market, but in some situations a single actual buyer would become a market.

"The term 'market' is usually associated with the sale, inspection, and supervision of food and food products designed for use by persons, and, although it has been extended by some courts to include food for domestic animals, the underlying idea in the term is the sale of products intended and designed primarily for human consumption.

"*As a noun.* When employed as a noun the word 'market' may mean simply purchase and sale, or it may mean the exchange of goods or provisions for money, purchase, or it may mean the rate of pur-chase and sale, or the demand there is for any particular article. It is also said that the term is used to denote that phase of commercial activity in which articles are bought and sold. * * *

"The more common use of the term is to signify place, and in this sense it means a public place; a market place; a designated place in a town or city to which all persons can repair who wish to buy or sell articles there exposed for sale; a place set apart for trading; * * *

"In a broader sense, the work 'market' may signify the region in which any commodity can be sold; a district of a country in which trade in one or several articles is habitually conducted so as to furnish a criterion of value of the thing, or criteria of the values of the things, there sold; * *

"*As a verb.* 'To market' has been defined judicially and by lexicographers as to buy or to sell; * * *

"'*Marketing*' signifies a bringing or sending to market, and includes buying as well as selling.

"'*Marketed*' means sold."

In 26A Words and Phrases Market, page 36, this rule of law is stated: "Since the word 'market' conveys the idea of selling, the term 'market value' would seem to mean the selling value. It is the price which an article will bring when offered for sale in the market. It is the highest price which those having the ability and occasion to buy are willing to pay. Brown v. W. T. Beaver Power Co., 52 S.E. 954, 955, 140 N.C. 333, citing Little Rock Junction Ry. v. Woodruff, 5 S.W. 792, 49 Ark. 381, 4 Am.St.Rep. 51."

The use of the word "market", deliver to market, as used by the parties in the lease contract necessarily meant that the corn was to be delivered for the purpose of sale where buyers and sellers meet. Under the law we find that "market" conveys the idea of selling and that, under the lease contract which designated the rent corn

should be delivered to the "nearest market", we think it was the intention of the parties that the rent corn be delivered to the nearest market for sale and that the trial court was in error in holding that defendant breached his contract in selling the corn in question.

We hold this although the evidence showed that in prior years the corn had been placed with the Commodity Credit Corporation. The evidence in this case clearly shows that the place designated for the delivery of the corn under the contract would not accept the corn excepting for sale; that its storage facilities had already been filled for the Commodity Credit Corporation and it could not be placed in the government loan at that time.

We note that the trial court and the referee both mentioned that the corn could have been stored on the farm. A fair interpretation of the lease agreement does not give plaintiff any authority to store corn on the farm. A compliance with the lease requires the corn be delivered to the "nearest market". There is no evidence that plaintiff would have gotten 50 or 60 cents a bushel premium for his corn had it been stored on the farm. Necessarily, there must have been extra cost entailed had the corn been stored on the farm. The 50 or 60 cents per bushel increase in price was for corn stored in the elevator. We think the fact that the corn had been stored on the farm in other years, by agreement, did not change the obligation of the parties under the lease. We note that this transaction took place after the filing of this lawsuit and we find that defendant complied with the lease agreement; that the corn was sold for its reasonable market value and plaintiff was not damaged. The judgment will be modified deleting from it the sum of $542.84.

■ Under point VI, error is alleged in the trial court's judgment ordering defendant to deliver complete possession of the real estate because defendant had fraudulently withheld from plaintiff portions of money, crops and livestock; because he had wrongfully refused to account for the same; because he had converted crops belonging to plaintiff; and because after notice he had refused to make a true account.

The judgment of the trial court on this point reads:

"The court further finds that the defendant was, during the time of the lease, in possession of crops, livestock and moneys that belonged to both plaintiff and defendant and that defendant, in violation of the conditions and the spirit of the lease, fraudulently withheld from plaintiff portions of said money, crops and livestock and wrongfully refused to account for same during the term of the lease and after demand in writing was duly made by plaintiff and that plaintiff was forced to file landlord's liens and this suit, and that some of the crops were converted by the defendant, no true account given by defendant, and that said violations of the contract on the part of the defendant continued during the life of said contract, and the Court finds that by reason of the conduct and demeanor of the defendant he has forfeited his rights thereunder and the contract and lease is declared to be null and void and the defendant is hereby ordered to forthwith surrender to the plaintiff full and complete possession of the farm land referred to in the evidence, * * *"

We find that the trial court's judgment as to forfeiture of the premises is not supported by the evidence. A careful consideration of the evidence discloses that at the time of the filing of the action for accounting herein plaintiff was actually indebted to the defendant. There is no evidence of any fraud or willful withholding of crop rents; most of the contention arises out of crops grown in 1958, after the filing of the lawsuit. The tender of rents made by the defendant to plaintiff clearly shows that defendant was not intentionally withholding any rents due under the lease contract. The trial court's judgment dividing the

crops grown in 1958 and not sold were proper under the evidence, but no evidence of any fraud or willful withholding of rents was disclosed. Defendant's contention as to this alleged error is sustained.

Under point VII, error is complained of in the court's judgment finding the lease null and void on the ground that there was no forfeiture clause in the lease and the court was without authority to declare it void.

It is admitted that the written lease contained no forfeiture clause and plaintiff's attorneys admitted that if the lease agreement did not constitute a joint adventure that, under the laws in Missouri, the trial court was in error.

It is plaintiff's contention that the trial court did not err in holding the lease null and void and ordering defendant to deliver possession of the real estate to plaintiff, first, because defendant fraudulently withheld from plaintiff portions of the money, crops and livestock; secondly, because defendant refused to account for the same; and, thirdly, because he gave no true account for same.

To support this contention, plaintiff cites Shell Petroleum Corporation v. Gowan, 240 Ala. 497, 199 So. 849. On page 850 [2, 3] of 199 So. the court stated:

"While it is well settled that a mere breach of the covenant in a lease to pay rent does not work a forfeiture or justify a rescission, 16 R.C.L. 1126, § 647, nevertheless it is also well settled that courts of equity have jurisdiction to decree rescission for vitiating fraud. 12 C.J.S., Cancellation of Instruments, p. 982, § 29.

"And we are of opinion that if the lessee systematically and fraudulently made deceitful misrepresentations in respect to the gallonage sold from said filling station, or fraudulently withheld the payment of the true amounts due under the lease for the first term, complainants, on equitable principles, should be relieved from the obliga-tion to renew for another term, and that the option in the lease for such renewal should be cancelled."

We have no fault to find with the law as declared in this case but the facts in the instant case are entirely different. No fraud or fraudulent misrepresentation or concealment of the amounts of rents due is shown by the evidence in the instant case.

Plaintiff cites 12 C.J.S. Cancellation of Instruments § 29, p. 983. This section reads:

"The general rule is that the equitable relief of rescission will not be granted for a mere breach of contract, the remedy in such a case being ordinarily found in an action at law, which will afford an adequate remedy. This is, of course, particularly true if the performance of the condition has been rendered impossible by plaintiff. As otherwise expressed, in the absence of fraud, mistake, trust, cloud on title, multiplicity of suits, undue influence, or some other independent ground of equitable jurisdiction, a court of equity will not interfere to rescind a contract on the sole ground that defendant has failed to perform his part of the contract or has broken its warranties or condition. * * *"

Plaintiff cites 32 Am.Jur. § 872, p. 738. This section holds: "Ordinarily a court of equity will not assume jurisdiction to enforce a forfeiture of a lease, but will leave the lessor to his remedy at law, and, under some circumstances, will even relieve a lessee of the common-law effect of a forfeiture of his term. However, in cases where the forfeiture works equity and protects the rights of parties, courts of equity will in effect enforce it; they will not reject it when it becomes a means of enforcing equitable rights. Under special circumstances equity will assume jurisdiction to interfere and cancel a lease to prevent irreparable injury to the lessor from the breach of the lessee's covenants and agreements in the lease, though the lease contained no express provision for re-entry or forfeiture, although in such cases it will

decree forfeiture of a lease only on clear proof of a legal right."

There is no evidence in the instant case that the plaintiff is about to, or has, suffered irreparable injury or that he has no adequate remedy at law.

In 51 C.J.S. Landlord and Tenant § 102, p. 677, the law is stated:

"Forfeiture, which is the right of the lessor to terminate a lease because of the lessee's breach of covenant or other wrongful act, is not favored by the courts, and provisions permitting forfeiture will be strictly construed against the lessor or the party invoking forfeiture.

"* * * The word as used in a lease does not, strictly speaking, refer to any right given to the lessee to terminate the lease. * * *"

In Waring v. Rogers, Mo.App., 286 S.W.2d 374, 379, [19, 20], the law is stated: "* * * To work a forfeiture of a leasehold estate at common law for non-payment of rent there must be a notice of forfeiture and a demand for the payment of the rent. Carbonetti v. Elms, Mo.App., 261 S.W. 748, and cases cited; 51 C.J.S., Landlord and Tenant, § 114 b, p. 694; Taylor's Landlord and Tenant, Ninth Ed., Vol. 1, § 297, p. 362; Thompson on Real Property, cit. supra, and § 1471. * * *"

There is no contention that there was any attempt to bring an action for rent and possession.

In Mullaney v. McReynolds, 170 Mo. App. 406, 155 S.W. 485, 488, [4], the law is stated: "There is an absence of any forfeiture clause in this lease for nonpayment of rent, and we agree with appellant that, in the absence of such forfeiture provision, nonpayment of rent does not generally give a right of forfeiture and re-entry." (Citing authority.)

In Haeffner v. A. P. Green Fire Brick Co., Mo., 76 S.W.2d 122, the Supreme Court held that forfeiture of leases is not favored at law and equity abhors forfeiture. See Edwards v. Collins, 198 Mo. App. 569, 199 S.W. 580.

■ Where a lease contains a provision authorizing the lessor to terminate the tenancy on a failure to pay rent, the lessor is authorized to end the lease. See Wilson v. Watt, Mo., 327 S.W.2d 841, 852 [14], and authorities cited. But, in the instant case, there was no such reservation, therefore, the lease could not be terminated excepting where there is fraud or irreparable damage for which the lessor could not be adequately protected by damages in a suit at law. No such conditions are present under the facts in the instant case.

■ Fraud cannot be presumed but must be affirmatively proved and the burden of proof is on the party who charges fraud. Shepherd v. Woodson, Mo., 328 S.W.2d 1, 6[1, 2]. In the instant case plaintiff wholly failed to prove fraud.

Plaintiff, in his argument and brief, on page 23, states:

"* * * rather, there was a joint adventure contemplated and actually put into effect in this case. In addition, the crops, livestock and moneys were under the sole control and possession of appellant, who fraudulently took them and dealt with them, in instances, without regard for the rights of respondent."

■ An examination of the pleadings in this case show that there were no allegations in the body of the petition pleading facts which would constitute a joint adventure and there was no evidence offered proving a joint adventure.

In Shafer v. Southwestern Bell Telephone Co., Mo., 295 S.W.2d 109, 116, [13, 15] the court defined joint adventure as follows: "A 'joint adventure,' as a legal concept, is of comparative recent origin, Neville v. D'Oench, 327 Mo. 34, 34 S.W. 2d 491, 503, and is founded entirely on

contract, either express or implied. It can exist only by voluntary agreement of the parties to it. It has been defined as an 'association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.' 48 C.J.S., Joint Adventures, § 1a. * * * As a general rule, in order to constitute a joint adventure, there must be a community of interest in the accomplishment of a common purpose, a mutual right of control, a right to share in the profits and a duty to share in the losses as may be sustained." (See numerous authorities cited.)

There was no joint adventure in the case at bar. The cause was not decided upon that basis and there are no facts offered in evidence that would support a finding on joint adventure.

The judgment of the trial court holding the lease void and ordering restitution of possession to plaintiff is reversed.

 The final contention of defendant is that the costs should not be taxed entirely against defendant. It is the contention that this is an action in equity where the court found partly for plaintiff and partly for defendant.

Ordinarily, a party prevailing in a case shall recover his costs against the other party, but in equity cases, courts have an inherent discretionary power to award costs by ordering either party to pay same or by apportioning the costs among the parties. Section 514.060 RSMo 1949, V.A.M.S.; Amitin v. Izard, Mo.App., 262 S.W. 2d 353; Evans v. Buente, Mo.Sup., 284 S.W.2d 543.

Under the facts in this case we deem it our duty to order the judgment as to costs set aside and judgment entered requiring each party to pay one-half the cost.

It is the order and judgment of this court that the money judgment of $1,371.39 be modified by reducing it to $728.81, in accordance with our findings; that the judgment of the trial court declaring the lease between the parties to be null and void and ordering possession of the leased premises delivered to plaintiff be reversed and judgment ordered entered for the defendant on this issue, and, that part of the judgment assessing all costs against the defendant is modified and the costs directed to be taxed in equal amounts against each of the parties. The trial court's judgment in all other respects is by this court affirmed.

STONE, P. J., and RUARK, JJ., concur.